UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JAMES CROCKETT & TERESA CROCKETT,

                Plaintiffs,

                  v.

THE CITY OF NEW YORK, POLICE OFFICER
RAUL A. PEREZ (Shield No. 2957), in his individual
and official capacities; POLICE OFFICER
MATTHEW J. AMBROSINO (Shield 1211), in his
individual and official capacities; POLICE OFFICER
STEVEN BHAGAN (Shield No. 13662), in his
individual and official capacities; LIEUTENANT
GREACIA HERDSMAN (ID. No. 901687), in her
official and individual capacities; JOHN AND
JANE DOES POLICE OFFICERS & DETECTIVES 1–8,
in their individual and
official capacities,

                Defendants.

-----------------------------------------------------------------x

**MEMORANDUM & ORDER**

11–CV–4378 (PKC)

PAMELA K. CHEN, United States District Judge:

       Plaintiffs James and Teresa Crockett bring this action pursuant to 42 U.S.C. § 1983 ("§ 1983")[1] and seek supplemental jurisdiction over related State law claims arising out of the shooting and arrest of James Crockett by New York City Police Department ("NYPD") officers on February 6, 2010. Defendant City of New York and Defendant-Officers Raul Perez, Matthew Ambrosino, Steven Bhagan, and Greacia Herdsman, (collectively, the "Defendant-Officers")

---

[1] During the briefing of this motion, Plaintiffs voluntarily withdrew James Crockett's *Monell* claim in Count Two. (*See* Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Pl. Opp."), Dkt. 38, at 2; Amended Complaint ("Am. Compl."), Dkt. 2, ¶¶ 117–193.) Therefore, Defendants' motion to preclude Plaintiffs' expert, Chief Timothy Longo, from offering evidence relating to the § 1983 municipal liability claim is denied as moot. (Defendants' Memorandum of Law in Support of Motion for Partial Summary Judgment ("Def. Mem."), Dkt. 34, at 30–35.)

now move for summary judgment with respect to all claims, except the § 1983 false arrest and excessive force claims alleged against Officer Perez. For the reasons discussed below, Defendants' motion is granted in part, and denied in part.

*BACKGROUND*

I.   February 6, 2010 Incident

On February 5, 2010, James Crockett ("Crockett" or "Plaintiff") left work at 5:00 p.m. and took the subway to the Fresh Pond Road Station in Brooklyn, New York. (Def. 56.1[2] ¶ 1.)[3] After getting off of the train, Crockett went to a bar. (*Id.* ¶ 2.) Over the course of the night, Crockett visited three bars. (*Id.* ¶ 3.) Defendants allege that by the time Crockett left the third bar, at approximately 1:00 a.m. on February 6, 2010, he was intoxicated. (*Id.* ¶ 5–6.)

Crockett claims that upon leaving the third bar, he walked a few feet and turned the corner, when he was "grabbed from the back" by an unknown assailant. (Pl. 56.1 ¶ 20.) Crockett alleges that while the assailant had him in a neck-hold, he recalled seeing a gun, which belonged to the assailant, and that the gun fell to the ground. (*Id.* ¶ 23.) Crockett claims that he then lost consciousness. (*Id.* ¶ 25.) There were two eyewitnesses to the incident, Ruth Albina

---

[2] Citations to "Def. 56.1" refer to Defendants' Statement of Material Facts pursuant to Local Rule 56.1. (Dkt. 31.) Citations to "Pl. 56.1" refer to Plaintiff's Counter-Statement of Undisputed Facts. (Dkt. 38–1.)

[3] The Court construes any disputed facts in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, where a party either (i) admits or (ii) denies without citing to admissible evidence facts alleged in the opposing party's Local Rule 56.1 Statement, the Court shall deem such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)– (d) ("56.1 Statement"). Thus, a standalone citation to a 56.1 Statement denotes that either the parties have, or the Court has, determined the underlying factual allegation to be undisputed. Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein unless otherwise noted.

and Petra Luna, who called 911, reporting an intoxicated male with a firearm, wearing a blue jacket with beige sleeves on Linden Street in Brooklyn.  (Def. 56.1 ¶ 7; Ex. D to Def. Mem.)

On February 5, 2010, NYPD Officers Raul Perez, Matthew Ambrosino, and Steven Bhagan, who were assigned to the 83rd Precinct's Street Conditions Observation Unit,[4] responded to the 911 call.  (Def. 56.1 ¶ 8.)  The officers drove to the scene in a police van.  (Id. ¶ 9.)  When the officers arrived at the scene, Officer Bhagan exited the van.  (Id. ¶ 10; Perez Tr.[5] 37:12–38:6.)  Officers Perez and Ambrosino continued driving down the street, when they observed Crockett, who matched the description of the individual reported in the 911 call.  (Def. 56.1 ¶ 11; Ambrosino Tr.[6] 23:22–24:6.)  Upon seeing Crockett, Officers Perez and Ambrosino both exited the van.  (Def. 56.1 ¶ 11; Ambrosino Tr. 35:17–40:25.)

Officer Perez claims that from the moment he exited the vehicle, Crockett was walking towards him (Perez Tr. 36:2–9); whereas, Crockett claims that he was lying on the ground when the police arrived.  (Pl. 56.1 ¶ 64.)  Officer Perez alleges that Crockett had a gun in his left coat pocket.  (Perez Tr. 46:14–19.)  Officer Perez testified that he told Crockett, "drop the gun" (Id. at 53:19–21), but that in response, Crockett extended the firearm towards Officer Ambrosino.  (Id. at 55:11–17.)  Officer Perez claims to have repeated, "drop the gun, police, don't move" (Id. at 56:7–11), but that Crockett "kept firm with the gun pointed at Ambrosino."  (Id. at 56:17–18.)

---

[4] The Street Conditions Observation Unit works to improve the quality of life in city neighborhoods and make city government more responsive to conditions that can negatively affect New York City residents.  See "Street Conditions Observation Unit", at http://www.nyc.gov/html/ops/html/data/street.shtml (last visited 5/18/2015.)

[5] Citations to "Perez Tr." refer to the testimony from Officer Raul Perez's 7/24/13 deposition.  (Ex. F to Pl. Opp.)  (Dkt. 38–6.)

[6] Citations to "Ambrosino Tr." refer to the testimony from Officer Matthew Ambrosino's 8/1/13 deposition.  (Ex. G to Pl. Opp.)  (Dkt. 38–7.)

Officer Ambrosino similarly claims that Crockett pointed the gun in his direction. (Ambrosino Tr. 47:15–23.) Officer Perez discharged his firearm twice, both rounds hitting Crockett (Def. 56.1 ¶ 12), and Crockett fell to the ground. (Ambrosino Tr. 53:24–54:5.) Officer Ambrosino claims that he then approached Crockett, and kicked the firearm out of his hand. (*Id.* at 52:13–53:13.)

Officer Bhagan claims that he was not present when Crockett was shot. (Bhagan Tr.[7] 25:4–14.) According to Bhagan, he was walking toward the scene, down Linden Street, when he heard shots fired from a distance. (*Id.* at 25:6.) Officer Bhagan continued walking down Linden Street in the direction of the gunshots.[8] (*Id.* at 27:3–9.)

Lieutenant Herdsman's accounts regarding her location at the time of the shooting are inconsistent. In her taped statement to NYPD's Brooklyn North Investigations Unit, she stated that was she exiting her car as the second shot was being fired by Officer Perez. (Ex. V to Pl. Opp.) However, in her deposition in this case, she testified that upon exiting her vehicle, she noticed the officers with their guns drawn. (Herdsman Tr.[9] 22:18–22:22.) Lieutenant Herdsman stated that she "noticed a male with a gun in hand pointed at the direction of the officers" (*Id.* at

---

[7] Citations to "Bhagan Tr." refer to the testimony of Officer Steven Bhagan's 8/9/13 deposition. (Ex. E to Pl. Opp.) (Dkt. 38–5.)

[8] In contrast to Officer Bhagan's deposition testimony, a NYPD injury report prepared by a Sergeant stated that, "PO Bhagan responded to a dispute with a firearm, during the course of the incident *a male pointed a firearm in his direction*, at which time a second officer fired his weapon striking the male." (Ex. AA to Pl. Opp. (emphasis added).) The report also indicated that Officer Bhagan suffered from a rapid heartbeat and dizziness as a result of the shooting incident. (*Id.*)

[9] Citations to "Herdsman Tr." refer to the testimony of Lt. Greacia Herdsman's 7/25/13 deposition. (Ex. D to Pl. Opp.) (Dkt. 38–6.)

22:18–24:2), and that she was within seven feet of Crockett when Perez fired both shots. (*Id*. at 29:2–7.)

According to Crockett, after he was shot, his wrists were bound with black electrical tape, and he was placed in a black van, not an ambulance. (Def. 56.1 ¶ 17.) However, the Ambulance Report indicates that the ambulance arrived at Linden Street and Myrtle Avenue at approximately 1:31 a.m. on February 6, 2010, and transported Crockett to Elmhurst Hospital for medical treatment. (*Id.* ¶¶ 18–20.) Crockett suffered, *inter alia*, two collapsed lungs, a shattered hip, damaged diaphragm, damaged bladder, spinal injuries, and paraplegia as a result of the shooting. (Pl. 56.1 ¶ 159.)

## II.  Separation of Crockett and His Wife

Crockett alleges that when he was transported to the hospital, his wife, Teresa Crockett ("Mrs. Crockett"), was prevented by a police officer from visiting and/or communicating with him for several days. Mrs. Crockett claims that she was prevented from speaking with doctors and medical staff, and as a result, "important procedures that would have been performed by the hospital to help Plaintiff walk could not be performed." (Pl. 56.1 ¶¶ 163, 174.) The Defendant-Officers assert that Mrs. Crockett visited her husband in the hospital, at the latest, 24 hours after Crockett was admitted, and that she may have been denied access to Crockett thereafter for two to four days. (Def. Mem. at 24.)

## III.  Witness Interviews

At approximately 2:05 a.m. on February 6, 2010, witness Ruth Albina was interviewed by NYPD Detective Geoffrey Hernandez at Albina's residence. (Def. 56.1 ¶ 21.) Albina then went to the 83rd Precinct to make a statement. (*Id.*) Albina stated that, at approximately 1:30 a.m. on February 6, 2010, she was in a vehicle with her friend, Petra Luna, parked at a fire

hydrant in the vicinity of 351 Linden Street.  (Ex. M to Def. Mem.)  Albina observed a male wearing a blue jacket, who had a gun in his hand, involved in a physical struggle with another man who was Mexican or Hispanic.  (*Id.*)  Albina became frightened and called 911.  (*Id.*)  Luna, the driver of the car, moved the car in reverse to approximately half a block from the scene.  (*Id.*)  She stated that she could see a white man on the ground, with a gun in his hand, and that he was trying to stand up but could not.  (*Id.*)  Ablina stated that when police arrived at the scene, she could no longer see the man, but that she heard shots fired. (*Id.*)

At the 83rd Precinct, at approximately 3:15 a.m. on February 6, 2010, Luna also gave a statement to Detective Hernandez.  (Def. 56.1 ¶ 23.)  Luna then gave a recorded statement at 7:34 a.m. in the presence of Assistant District Attorney ("ADA") John Rudikoff, Detective Hernandez, and other members of the NYPD.  (Ex. O to Def. Mem.)  Luna stated that she was in her vehicle in front of 351 Linden Street when she observed a struggle between two people.  (*Id.*)  She observed that one of the participants was a white male with grey hair who was wearing a blue jacket with beige sleeves.  (*Id.*)  Luna recalled that the other participant was a Hispanic male who was shorter than the white male.  (*Id.*)  She stated that a gun fell to the ground during the struggle.  (*Id.*)  She asserted that the white male fell to the ground as he was trying to grab the gun.  (*Id.*)  She recalled that she felt scared because the firearm was close to the white male's hand so she began to drive in reverse.  (*Id.*)  At the time of the shooting, her car was approximately ten car-lengths from the scene.  (Luna Tr.[10] 30:20–23.)  Luna saw officers exit their vehicle.  (*Id.* at 34:7–35:8; Ex. O to Def. Mem.)  One of them shouted, and then one of the officers fired his gun twice.  (*Id.*)  Luna could not see the white male on the ground at the time of the shooting.  (*Id.*)

---

[10] Citations to "Luna Tr." refer to testimony from Petra Luna's 8/7/13 deposition.  (Ex. C to Pl. Opp.)  (Dkt. 38–4.)

IV.   Criminal Complaint

On February 6, 2010, at approximately 1:36 p.m., Detective Hernandez received a phone call at the 83rd Precinct from John P. Birmingham, Esq.  (Def. 56.1 ¶ 25.)  Birmingham stated that he had been retained by Crockett's family, and requested that his client not be interviewed.  (*Id.*)  On February 6, 2010, Detective Hernandez signed a criminal court complaint charging Crockett with (1) N.Y. Pen. L. §120.18 – Menacing of a Police or Peace Officer; and (2) N.Y. Admin. Code 10–131(B)(1) – Selling or Possessing of Air Pistols and Air Rifles.  (*Id.* ¶ 26.)

V.   Grand Jury

On February 11, 2010, Crockett was indicted by a Grand Jury on felony charges of Menacing in the Second Degree and Menacing in the Third Degree.  (*Id.* ¶ 27.)  Crockett alleges that he did not testify in the Grand Jury because he was seriously injured and hospitalized at the time.  (Pl. 56.1 ¶ 128.)  Crockett claims that his attorney subpoenaed a number of witnesses, including Albina and Luna, to testify, but that none of these witnesses were called to offer any information to the Grand Jury.  (*Id.* ¶ 131.)  On February 16, 2010, an arrest warrant was issued for Crockett based on the indictment.  (Def. 56.1 ¶ 28.)

On March 10, 2010, ADAs Nancy Laxer and Vasantha Rao advised Crockett's attorney that in order to investigate any allegation that Crockett was robbed on February 6, 2010, he would need to file an official complaint with the NYPD.  (*Id.* ¶ 34.)  On April 13, 2010, the State court denied Crockett's motion to dismiss the indictment or, in the alternative, to reduce counts therein, finding that the proof put before the Grand Jury was legally sufficient to establish the charged offenses and that the grand jury proceedings, therefore, were not defective.  (*Id.* ¶ 35.)

VI.    50-h Hearing

On or about May 19, 2010, the Comptroller's Office sent a notice of a 50-h hearing to Plaintiffs' attorney in this matter informing them that Plaintiffs were required by law to appear and give testimony on June 8, 2010, pursuant to New York General Municipal Law ("GML"). (*Id.* ¶ 39.)  Plaintiffs requested an adjournment of the June 8, 2010 hearing, and the request was granted.  (*Id.* ¶ 40.)  The hearing was rescheduled for July 26, 2010.  (*Id.*)  Plaintiffs requested an adjournment of the July 26, 2010 hearing, and that request was granted.  (*Id.* ¶ 41.)  The hearing was rescheduled for October 27, 2010.  (*Id.*)  Plaintiffs requested an adjournment of the October 27, 2010 hearing, and the request was granted.  (*Id.* ¶ 42.)  The hearing was rescheduled for January 31, 2011.  (*Id.*)  Plaintiffs requested an adjournment of the January 31, 2011 hearing, and the request was granted.  (*Id.* ¶ 43.)  The hearing was rescheduled for April 5, 2011.  (*Id.*)  Plaintiffs requested an adjournment of the April 5, 2011 hearing, but Defendants did not respond to that request.  (*Id.* ¶ 44; Pl. 56.1 ¶ 187.)  The April 5, 2011 hearing did not go forward because Plaintiffs failed to appear.  (Def. 56.1 ¶¶ 45–46.)

VII.    Criminal Charges Dismissed

On May 9, 2011, the criminal charges against Crockett were dismissed, on the prosecution's motion, in the interests of justice.  (*Id.* ¶ 36.)

*DISCUSSION*

I.    Summary Judgment Standard

The standard for summary judgment is well established.  Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *see Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011); *see also F.D.I.C. v. Great American Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 167 (2d Cir. 2009) (internal quotations and citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alterations in original); *see also Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56–57 (2d Cir. 2012); *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005). The nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation," *Jeffreys*, 426 F.3d at 554 (quotations and citations omitted); *see also DeFabio v. East Hampton Union Free Sch. Dist.*, 623 F.3d 71, 81 (2d Cir. 2010); and must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner*

*v. Clinton Cnty.*, 541 F.3d 464, 471 (2d Cir. 2008). In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props.*, *Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

II.    <u>False Arrest Claim</u>

The elements of a Section 1983 claim for false arrest, as to which the plaintiff would bear the burden of proof at trial, are "substantially the same" as those of a "claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Under New York law, the plaintiff must establish that "the defendant intentionally confined him without his consent and without justification." *Id.* Probable cause rebuts this presumption of no justification, and is, thus, a "complete *defense* to an action for false arrest." *Id.* (emphasis added) (quoting *Bernard v. U.S.*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("The defendant has the burden of raising and proving the *affirmative defense of probable cause*.") (emphasis added; quotations omitted). The standard for probable cause is "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. This standard does *not* demand that the arresting officer "believe with certainty that the arrestee will be successfully prosecuted." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

Here, Crockett was effectively seized when he was shot by Officer Perez. (Def. Mem. at 3.) *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."); *Hickey v. City of New York*, No. 01 Civ. 6506, 2004 WL 2724079, at *8 (S.D.N.Y. Nov. 29, 2004) ("A suspect is seized for purposes of

the Fourth Amendment when he is shot in an effort to bring him under police control.") (citing *Tennessee*, 471 U.S. at 7). The Defendant-Officers argue that, "even though the false arrest claim against Officer Perez must go to the jury for resolution, the Court may nevertheless resolve any purported false arrest claim against the remaining defendants in their favor." (Def. Mem. at 4.)

The issue with respect to the remaining Defendant-Officers is whether they can be found liable for false arrest for binding or handcuffing Crockett's hands and taking him into custody after he was shot by Officer Perez. (Pl. Opp. at 4; Pl. 56.1 ¶ 30; Perez Tr. 64:15–65:2.) Although Plaintiffs fail to identify the individuals who allegedly handcuffed Crockett and/or bound his hands with electrical tape,[11] there is evidence that at least two of the Defendant-Officers were involved. Officer Perez testified that he assisted "a female officer" and Officer Ambrosino in handcuffing Crockett. (Perez Tr. 64:15–65:2.) Officer Ambrosino testified that only Officer Perez handcuffed Crockett. (Ambrosino Tr. 56:7–22.) Officer Bhagan did not recall whether Crockett was handcuffed. (Bhagan Tr. 38:15–19.) Lieutenant Herdsman stated that she saw Crockett being handcuffed, but did not recall who handcuffed him. (Herdsman Tr. 34:17–25.) Here, given the factual dispute regarding whether Defendant-Officers Perez and Ambrosino were both involved in handcuffing Crockett, and viewing the facts in a light most favorable to him, there remains a material issue of fact relating to the false arrest claim as to those Defendant-Officers Perez and Ambrosino.[12]

---

[11] Plaintiffs' false arrest claim names all of the Defendant-Officers. (Am. Compl. ¶¶ 214–23.)

[12] Despite asserting that *each* of the Defendant-Officers "actively assisted Defendant Perez in [Crockett's] *arrest* and detention" (Pl. Opp. at 5 (emphasis added)), Plaintiffs point to no evidence that Officer Bhagan or Lieutenant Herdsman was directly involved in the handcuffing, arrest, or detention of Crockett. At most, Plaintiffs argue that Officer Perez testified that Lieutenant Herdsman handcuffed Crockett. (*Id.*) However, Plaintiffs mischaracterize Officer

The Defendant-Officers advance three arguments to support dismissal of Plaintiffs' false arrest claim as to the Defendant-Officers other than Officer Perez ("Other Defendant-Officers"). First, they argue that the Other Defendant-Officers could not have participated in Crockett's arrest and detention because Crockett was already seized by virtue of having been shot by Officer Perez. (Def. Mem. at 3–4.) However, to the extent that Other Defendant-Officers assisted in handcuffing Crockett and transporting him to the precinct for arrest processing, they could still be held liable for false arrest, if there was no justification for further restraining Crocket and taking him into custody. *See Wong v. Yoo*, 649 F. Supp. 2d 34, 60 (E.D.N.Y. 2009) (denying summary judgment where, under plaintiff's account of handcuffing, plaintiff had visible injuries and there was "the lack of any threat of immediate harm" to the officers or others); *Gonzalez v. City of New York*, No. 03 Civ. 1260, 2006 WL 1995127, at *3–4 (E.D.N.Y. July 14, 2006) (denying summary judgment on false arrest claim where differing accounts of use of force during stop). Thus, Officer's Perez's shooting of Crockett does not preclude liability for false arrest of any Other Defendant-Officers who assisted in handcuffing or further restraining Crockett and taking him to custody.

Second, the Defendant-Officers argue that the collective knowledge doctrine supports a finding of non-liability as to the Other Defendant-Officers for false arrest. (Def. Mem. at 5–6.) That doctrine, however, cannot be applied to the circumstances of this case. Officer Perez's act of shooting Crockett cannot constitute "vouching for probable cause" because all of the Other Defendant-Officers, save perhaps Officer Bhagan, had the same knowledge as Perez regarding

---

Perez's testimony. Officer Perez testified that *both* a female officer *and* a female lieutenant arrived to the scene and that the "female officer" handcuffed Crockett. (Perez Tr. at 64:15–65:2.) Officer Perez's testimony, therefore, does not provide support for the conclusion that Lieutenant Herdsman assisted in handcuffing Crockett. Accordingly, Plaintiffs' false arrest claim is dismissed as to Defendant-Officers Bhagan and Herdsman.

the existence, or non-existence, of probable cause to shoot and arrest Crockett. *See Golphin v. City of New York*, No. 09 Civ. 1015, 2011 WL 4375679, at *2 (S.D.N.Y. Sept. 19, 2011) ("the law shields an arresting officer from liability for false arrest if the officer relies on a fellow officer who vouches for probable cause."). This is not a situation where the Other Defendant-Officers were relying on the superior knowledge of their fellow officer, Perez, regarding the "underlying facts that provided probable cause or reasonable suspicion." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). Thus, the collective knowledge doctrine simply has no application here.

Third, the Defendant-Officers argue that the false arrest claim should be dismissed as to the Other Defendant-Officers on the basis of qualified immunity. (Def. Mem. at 6–7.) However, the Court finds that it cannot be determined at this stage whether the Other Defendant-Officers violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If the jury finds that Officer Perez shot an unarmed man without probable cause, it could also find that the Other Defendant-Officers, who witnessed the entire incident, knew or believed that the shooting and arrest of Crockett were unlawful, which could defeat a finding of qualified immunity. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (when material facts pertaining to immunity are in dispute, the appropriate procedure is to allow the jury to resolve any disputed facts that are material to the qualified immunity issue, so that the court may make the "ultimate determination of whether the officer's conduct was objectively reasonable. . ."). Thus, it is premature to make a finding with respect to the Other Defendant-Officers' entitlement to qualified immunity.

Accordingly, summary judgment on Plaintiffs' false arrest claim is denied as to Officers Perez and Ambrosino, but granted as to Officer Bhagan and Lieutenant Herdsmen.

III.    Excessive Force Claim

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). To establish a claim for excessive force under a failure to intervene theory, a plaintiff must prove that the officer (1) observed, or had reason to know of, the alleged violation, and (2) there was a realistic opportunity to intervene to prevent the harm from occurring. *Smith v. P.O. Canine Dog Chas*, No. 02 Civ. 6240, 2004 WL 2202564, at *9 (S.D.N.Y. Sept. 28, 2004). Whether "an officer . . . was capable of preventing the harm being caused by another officer is an issue of fact for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* (quoting *Anderson*, 17 F.3d at 557).

Here, it is undisputed that Officer Perez was the only officer to discharge his firearm. (Def. Mem. at 8.) Defendants do not dispute that the excessive force claim against Officer Perez must be decided by a jury. (*Id.*) However, Crockett argues that issues of fact exist as to whether the Other Defendant-Officers failed to intervene in the shooting. (Pl. Opp. at 10–12.) Crockett also claims that the Defendant-Officers, including Officer Perez, used excessive force in handcuffing Crockett or binding his hands with electrical tape. (*Id.*)

A.    Failure to Intervene

Plaintiffs cannot show that Defendants had a realistic opportunity to intervene to prevent the shooting, especially given the fast paced nature of the encounter. Officer Ambrosino testified that after Crockett pointed a gun at him, he backed up to the rear of the police vehicle,

approximately seven to eight feet from Officer Perez, but could not see Perez when Perez fired the two shots. (Ambrosino Tr. 44:22–45:25; Perez Tr. 133:23–134:5.) Officer Bhagan testified that he was walking down Linden Street when he heard an officer state that there was a gun. (Bhagan Tr. 23:7–24:24.) He stated that he started to walk toward the voices when he heard a gunshot, and then took cover. (*Id.* at 25:3–26:18.) Lieutenant Herdsman recalls that when she arrived at the scene she saw two officers with their guns drawn. (Herdsman Tr. 27:6–14.) As she exited the car, Officer Perez, who was several feet away, fired his gun twice at Plaintiff. (*Id.* at 27:15–28:16.) Based upon the distances between the Other Defendant-Officers and Officer Perez, and the fact that the two shots were fired in rapid succession and without notice or warning, the Other Defendant-Officers did not have a realistic opportunity to intervene to prevent the shooting. (Ambrosino Tr. 119:24–120:8; Perez Tr. 133:23–134:21; Herdsman Tr. 27:4–21.) *See Johnson v. City of New York*, No. 05 Civ. 7519, 2008 WL 4450270, at *6 (S.D.N.Y. Sept. 29, 2008) ("Here, there is no evidence from which a reasonable jury could conclude that the other officers had sufficient time to prevent the alleged use of force which, by plaintiff's own account, lasted only for 'a couple of seconds.'") (citation omitted); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (finding no realistic opportunity to intercede in use of excessive force by officer where punches occurred in rapid succession); *Figueroa v. Mazza*, No. 11 Civ. 3160, 2014 WL 4853408, at *8 (E.D.N.Y. Sept. 30, 2014) (finding that the blows occurred in such rapid succession that defendants did not have a realistic opportunity to intervene). Accordingly, the excessive force claim for failure to intervene as to Defendant-Officers Ambrosino, Bhagan, and Herdsman is dismissed.

B. <u>Excessive Force Use During Handcuffing</u>

Plaintiffs also appear to claim that the Defendant-Officers used excessive force when they allegedly bound Crockett's hands with electrical tape after he was shot. (Pl. Opp. at 11–12.) Plaintiffs do not argue that it was excessive for Crockett to be handcuffed after he was shot; rather, that the handcuffing itself was done in an excessive manner. (*Id.*)

In determining whether handcuffing amounts to excessive force, the Court considers (1) whether the handcuffs were too tight; (2) whether the defendant-officers ignored the plaintiff-arrestee's complaints about the handcuffs being too tight; and (3) the degree of injury caused by the handcuffing. *Hanniford v. City of New York*, No. 12 Civ. 0040, 2015 WL 588766, at *3 (E.D.N.Y. Feb. 11, 2015). Evidence of injury is important. *See Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. Mar. 26, 2013) ("The injury requirement is 'particularly important.'") (quoting *Sachs v. Cantwell*, No. 10 Civ. 1663, 2012 WL 3822220, at *13 (S.D.N.Y. Sept. 4, 2012)). Here, Plaintiffs do not allege any distinct injury from Crockett's hands being bound or handcuffed, and all injuries he suffered stem from the shooting.

At most, Crockett claims that he had "black marks" on his wrists from taking off the tape and these marks remained there for weeks. (Crockett Tr.[13] 103:7–15.) Other than these alleged marks, Plaintiffs fail to offer evidence establishing any of the other excessive force criteria in connection with Crockett's handcuffing by the Defendant-Officers. Plaintiffs do not allege or prove that Crockett complained to the Defendant-Officers about the handcuffs or binding being too tight at the time of his arrest. Nor did Crockett seek medical treatment for any injuries to his hands or wrists. *See, e.g.*, *Usavage*, 932 F. Supp. 2d at 592 (noting that "[t]he most common injuries to satisfy the injury requirement in handcuff cases are scarring and nerve damage")

---

[13] Citations to "Crockett Tr." refer to the testimony from James Crockett's 7/30/13 deposition. (Ex. A to Pl. Opp.) (Dkt. 38–3.)

(citing cases). Given the absence of any evidence that Crockett was injured or contemporaneously complained of injury, the Court finds that the Defendant-Officers' handcuffing of Crockett cannot support an excessive force claim.

IV.    Malicious Prosecution Claim

"A malicious prosecution claim under New York law requires the plaintiff to prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. Mar. 29, 2007) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003)) (internal quotation marks omitted). In addition to these State law elements, a malicious prosecution claim brought under § 1983 requires "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

Crockett's federal and state malicious prosecution claims fail because the "in the interest of justice" dismissal of the charges against him was not a favorable termination. As a general matter, a favorable termination requires that the prosecution be terminated on the merits. *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("[A] decision on the merits [is] an essential element of a cause of action for malicious prosecution. . ."). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002); *see Wong v. Yoo*, 649 F. Supp. 2d 34, 66 (E.D.N.Y. 2009) (applying *Fulton* standard); *Furgang & Adwar, LLP v. Fiber–Shield Indus.*, 866 N.Y.S.2d 250, 251 (2d Dep't 2008) ("To show a termination in [its] favor, the

plaintiff must prove that the court passed on the merits of the charge or claim against [it] under such circumstances as to show [its] innocence or nonliability, or show that the proceedings were terminated or abandoned at the instance of the defendant under circumstances which fairly imply the plaintiff's innocence." (alteration in original; citations omitted).

This is not a case in which criminal charges were terminated on the basis of evidence establishing Plaintiff's innocence. *See e.g.*, *Roberts v. Babkiewicz*, 582 F.3d 418, 422 (2d Cir. 2009) (dismissal after prosecutors uncovered medical evidence proving the defendant's innocence). Nor is it, contrary to Plaintiff's assertions, (Pl. Opp. 21–22), a case where the prosecution's reasons for seeking dismissal are unclear or disputed. *Cf. Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) ("[W]hen the grounds for the dismissal of a criminal proceeding are unclear, New York courts consider whether the proceeding was terminated in plaintiff's favor to be a question of fact that prevents summary judgment.").

At the dismissal proceeding, the prosecution stated, on the record, that "nothing has changed in terms of [the] evidence or [the People's] ability to prove this case at trial", and that the prosecution was moving for dismissal only because of "[Crockett's] age, his lack of a criminal record, as well as [the People's] compassion for his current physical condition and prognosis. . . ." (Ex. EE to Def. Mem.) Indeed, the prosecution's reasons are borne out by the record: Crockett was 60 years old at the time of his arrest; he was employed at the time of his arrest; he had no criminal record; and he was rendered paralyzed and wheelchair-bound as a result of being shot by the police at the time of his arrest. Plaintiffs offer no evidence to contradict the prosecution's stated reasons for the dismissal.

Thus, the undisputed record demonstrates that the termination of Plaintiff's prosecution was motivated by mercy, and does not constitute a favorable termination. *See Murphy v. Lynn*,

118 F.3d 938, 949 (2d Cir. 1997) (while an interest-of-justice dismissal, under certain circumstances, could be considered a dismissal favorable to the accused, "the prevailing view is that if the abandonment was the result of a compromise to which the accused agreed, or *an act of mercy requested or accepted by the accused*, or misconduct by the accused, it is not a termination in favor of the accused for purposes of a malicious prosecution claim") (emphasis added). Indeed, in a case relied upon by Plaintiff, *Cantalino v. Danner*, 96 N.Y.2d 391 (2001), the New York Court of Appeals made it clear that a termination is *not* favorable "if [the] charges are dismissed out of mercy, since mercy presupposes the guilt of the accused." *Id*. at 395 (citing, *inter alia*, *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 197 (2000)). Accordingly, because Crockett cannot show a favorable termination of his criminal prosecution, summary judgement is granted in favor of Defendants on Plaintiffs' federal and state malicious prosecution claims.[14]

V.    Malicious Abuse of Process Claim

The elements of a malicious abuse of process claim under § 1983 are governed by State law. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Under New York law, "'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act; (2) with the intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'"[15] *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook*, 41 F.3d at 80).

---

[14] The Court does not address the other factors relating to the malicious prosecution claim because of the grant of summary judgment on the basis of the termination of prosecution element.

[15] Notably, unlike a claim for malicious prosecution, the tort of abuse of process has no favorable termination requirement.

The Court finds that a factual issue exists with respect to the first element of Plaintiff's abuse of process claim, *i.e.*, whether Plaintiff's arrest constitutes "the proper use of legal process based on an improper or malicious *motive*." *Pinter v. City of New York*, 976 F. Supp. 2d 539, 568 (S.D.N.Y. 2013) (emphasis in original). Defendants contend that Plaintiff's arrest cannot meet this element because the abuse of process must occur *after* the process has been issued, and the mere act of issuing process—here, arresting Plaintiff—does not give rise to a claim of abuse of process. (Def. Reply[16] at 15). However, the New York Court of Appeals has noted in dicta that "nothing in this Court's holdings would seem to preclude an abuse of process claim based on the issuance of the process itself." *Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d 523, 530 (1991)[17]; *see TADCO Const. Corp. v. Dormitory Auth. of State of New York*, 700 F. Supp. 2d 253, 272 (E.D.N.Y. 2010) (discussing "split of opinion" on whether "New York law permits abuse of process claims 'based on the issuance of process itself,' as opposed to some abuse of the process after it is issued", and relying on *Parkin*, in finding that the plaintiff could pursue an abuse of process claim based on defendant's arrest of plaintiff for a collateral purpose). Indeed, numerous courts have found the issuance-of-legal-process element met by an officer's arrest of, or issuance

---

[16] Citations to "Def. Reply" refer to Defendants' Reply Memorandum of Law in Further Support of Their Motion for Partial Summary Judgment, filed 1/12/15. (Dkt. 37.)

[17] In *Parkin*, the Court of Appeals similarly noted:

> The Appellate Division's alternative holding that abuse of process requires some improper conduct *after* issuance of process finds support in the language of several of our cases. We have noted several times that "[t]he gist of the action for abuse of process lies in the improper use of process after it is issued." (*Dean v. Kochendorfer*, 237 NY 384, 390; *see, Curiano v. Suozzi*, 63 NY2d 113, 117; *Hauser v. Bartow*, 273 NY 370, 373). It is not clear, however, whether this language should be viewed as a strict and limiting definition of the tort or whether it is merely illustrative.

78 N.Y.2d at 530.

of tickets to, a plaintiff, so long as the issuance was "for a collateral objective outside the legitimate ends of process". *Mangino v. Inc. Village of Patchogue*, 739 F. Supp. 2d 205, 231–32 (E.D.N.Y. 2010) (finding repeated issuance of traffic tickets was "a process capable of being abused" and satisfied the first element of an abuse of process claim, where the issuance had the collateral objective of getting plaintiffs to drop their opposition to the town's rental permit laws); *see, e.g., Pinter*, 976 F. Supp. 2d at 569 (finding "use of prostitution arrests for leverage in negotiations over nuisance abatement, without any apparent interest in conviction" constituted a viable abuse of process claim); *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 447 (E.D.N.Y. 2012) (finding abuse of process claim based on municipal defendants' alleged threats and initiation of criminal prosecution against plaintiffs solely to pressure them to refrain from defending themselves in a construction permitting dispute). Thus, a jury could find that Plaintiff's alleged false arrest, if executed by the Defendant-Officers for a "collateral objective outside the legitimate ends of the process", satisfies the first element of an abuse of process claim.

With respect to the second element, Plaintiffs contend that the Defendant-Officers acted with improper purpose when they fabricated information to support their arrest of Crockett. As discussed below, there is a genuine issue of material fact as to whether the Defendant-Officers committed these acts.

Regarding the third element, the Court finds that Plaintiffs have sufficiently demonstrated an issue of fact about the collateral objective behind the Defendant-Officers' arrest of Crockett. The collateral objective element is the "crux of a malicious abuse of process claim." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009); *Savino*, 331 F.3d at 76–77 (issuance of criminal process does not give rise to § 1983 claim unless defendant pursued an

illegitimate collateral objective after process issued). "[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77. "A malicious abuse of process claim thus requires an ulterior purpose such as the infliction of economic harm, extortion, blackmail, or retribution." *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 391 (E.D.N.Y. 2013).

Here, Plaintiffs allege that the Defendant-Officers' "collateral purpose" in arresting Crockett was to conceal their own misconduct in connection with Crockett's shooting and false arrest, in order to escape disciplinary charges and potential loss of employment. (Pl. Opp. at 27–29.) Courts have found that a desire to protect one's employment can constitute a collateral purpose. *See*, *e.g.*, *Hoyos*, 999 F. Supp. 2d at 391; *Douglas*, 595 F. Supp. 2d at 344 (S.D.N.Y. 2009) ("Fabricating assault charges to save one's job could be abuse of process, however, because 'safeguarding one's own employment lies outside the legitimate goal of criminal process.'") (quoting *Hernandez v. Wells*, No. 01 Civ. 4376, 2003 WL 22771982, at *9 (S.D.N.Y. Nov. 24, 2003)).

However, as the Defendant-Officers point out, Plaintiff's abuse of process claim focuses on the Defendant-Officers' false statements as part of the Departmental investigation into the shooting, as if that was the process being abused, rather than on Plaintiff's arrest.[18] (Pl. Opp. at 27–29.) Crockett fails to explain how his arrest, which is only legal process the Defendant-

---

[18] While the Court finds that the relevant "process" for purposes of this claim is the arrest and not the Departmental investigation, the fact that the Defendant-Officers were immediately subject to an investigation, consistent with NYPD procedure where there is an officer-involved shooting, may be probative of the Defendant-Officers' intent with respect to Crockett's arrest and their involvement in providing evidence to support that arrest.

Officers used, furthered the collateral objective of protecting them from disciplinary action.[19]

The Court, though, drawing all reasonable inferences in Crockett's favor, finds that a jury could conclude that the Defendant-Officers falsely arrested him in order to legitimize the shooting and to make it more difficult for Crockett to pursue legal action against the Defendant-Officers for their involvement in the shooting and arrest, or give evidence in the Department's investigation of the shooting.

Because there is an issue of fact about whether the Defendant-Officers provided false information to support their arrest for a collateral purpose, namely to prevent themselves from suffering any adverse employment action, summary judgment on this claim is denied.[20]

VI.    Substantive Due Process Rights Claims

Substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests."  *Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).  To state a claim for a

---

[19] However, Plaintiffs do cite to information indicating that the Defendant-Officers provided statements, which Plaintiffs allege were false, to support the arrest complaint that was signed by Detective Hernandez.  *See* Ex. V to Pl. Opp. (recorded interviews of Defendant-Officers Herdsman, Ambrosino, and Bhagan on 2/6/10, the same day as the shooting, and prior to the filing of a criminal court complaint by Det. Hernandez).  Logically, since Detective Hernandez was not present at the scene of the alleged crime, he had to have relied on the Defendant-Officers' accounts of the shooting and arrest, in swearing out the criminal complaint.  Thus, an argument can be made that the Defendant-Officers provided false statements to secure Plaintiff's arrest, in order to further the collateral objective of protecting them from disciplinary action. Furthermore, it is only logical that these same statements by the Defendant-Officers were provided, either directly or in summary form, to the District Attorney's Office, and formed the basis of the criminal case against Crockett.  As previously noted, at the dismissal proceeding, the ADA stated on the record that, "nothing has changed in terms of [the] evidence or [the People's] ability to prove this case at trial", and that the prosecution was seeking dismissal based solely on Crockett's personal factors.  (Ex. EE to Def. Mem.).

[20] Since the elements of a malicious abuse of process claim under State law are the same as the elements under § 1983, the State law claim also survives.

23

violation of substantive due process, a plaintiff must demonstrate that the state action was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999). "It is not enough that the government act be 'incorrect or ill-advised'; it must be 'conscience-shocking.'" *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* (quoting *Tenenbaum*, 193 F.3d at 600).

Here, Plaintiff[21] argues that his rights to familial association, bodily integrity, intimate association, and access to the courts were all violated.[22] (Pl. Opp. at 29–34.) While there remain

---

[21] Mrs. Crocket alleges that her substantive due process rights were violated when she was separated from her husband at the hospital. (Pl. Opp. at 32.) However, Mrs. Crockett is not entitled to derivative damages based on an alleged § 1983 civil rights violation. *See e.g., Bright v. City of New York*, 1985 WL 505, at *3 (S.D.N.Y. Apr. 4, 1985) ("It appears that an individual's claim for emotional distress arising from alleged violations of a loved one's civil rights, standing alone, is not cognizable under section 1983."); *Zamora v. N. Salem Cent. Sch. Dist.*, 414 F. Supp. 2d 418, 427 (S.D.N.Y. Feb. 9, 2006) (stating that infant-plaintiff's mother was not entitled to derivative damages based on Title IX or § 1983 civil rights violations). Nor does Mrs. Crockett make any showing of an independent constitutional deprivation. Therefore, only Mr. Crockett's substantive due process claims will be analyzed.

[22] Defendants are correct that Crockett's substantive due process claims for excessive force, false arrest, and malicious prosecution merge with his Fourth Amendment claim because the former claim arises from the same conduct that allegedly violated his Fourth Amendment rights. (Def. Mem. at 22–23.) *See Kia P.*, 235 F.3d at 757–58 ("[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of 'substantive due process.'") (quoting *Conn v. Gabbert*, 526 U.S. 286, 293 (1999)); *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 440 (E.D.N.Y. 2006) (dismissing substantive due process claims because they "arise from the same conduct by defendants, and seek a remedy for the same injuries, as their Fourth Amendment claims."). However, the substantive due process claims relating to Crockett's separation from his family at the hospital and his right to testify at the grand jury involve a different set of facts than those surrounding the shooting and arrest, and thus are not duplicative of his Fourth Amendment claims.

genuine issues of fact as to whether Crockett's forced separation from his family immediately after he was shot and in the hospital, and the convening of the grand jury proceedings five days after the incident, while Crockett was seriously injured and unable to testify on his own behalf, constituted "outrageous", "conscience-shocking", "shocking, arbitrary, and egregious" conduct, Crockett's due process claims ultimately fail because he has provided no evidence that any of the Defendant-Officers was involved in this conduct.[23]  Accordingly, Plaintiffs' substantive due process claims are dismissed.

VII.  State Law Claims

The Defendant-Officers argue that any State law claims alleged by Plaintiffs, including malicious prosecution, abuse of process, loss of consortium, intentional infliction of emotional distress[24], should be dismissed because Plaintiffs failed to comply with notice of claim requirements under New York law.  (Def. Mem. at 36–39.)

---

[23] Although Plaintiffs name "John and Jane Does Police Officers and Detectives 1–8" in their complaint, they have failed to identify these individuals within the three-year statute of limitations for § 1983 claims. *See Owens v. Okure*, 488 U.S. 235, 251 (1989) (statute of limitations for a claim under 42 U.S.C. § 1983 is three years).  Failure to identify and serve John and Jane Doe Defendants within the statute of limitations is fatal to claims against them. *See Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 468–70 (2d Cir. 1995).

[24] Mrs. Crockett's claims for loss of consortium and intentional infliction of emotional distress are pled under 42 U.S.C. § 1983.  (Am. Compl. ¶¶ 225–252.)  However, loss of consortium is not cognizable under § 1983.  *See Wahhab v. City of New York*, 386 F. Supp. 2d 277, 292 (S.D.N.Y. 2005) ("§ 1983 does not support derivative claims for loss of consortium."); *Kreutzberg v. Cnty. of Suffolk*, No. 04 Civ. 3835, 2006 WL 3370351, at *4 (E.D.N.Y. Nov. 20, 2006) (noting that while the Circuit has not ruled on whether a claim for loss of consortium can be brought under Section 1983, Second Circuit district courts and the Sixth Circuit have held that a loss of consortium claim is a derivative claim that is not cognizable under Section 1983). Intentional infliction of emotional distress is also not cognizable under § 1983.  *See Love v. Riverhead Cent. Sch. Dist.*, 823 F. Supp. 2d 193, 199 (E.D.N.Y. 2011) ("[I]t is well-settled that a cause of action may not be asserted pursuant to Section 1983 for emotional distress, loss of society, loss of services, or any other consequent collateral injuries allegedly suffered personally by a victim's family members.").  Accordingly, these claims must be examined in the State law context.

Under GML § 50, no personal injury action may be maintained against a city or its officers, agents, or employees unless a notice of claim is first served upon the city. GML §§ 50-e, 50-i(1). "In federal court, State notice-of-claim statutes apply to state-law claims." *Parise v. New York City Dep't of Sanitation*, 306 F. App'x 695, 697 (2d Cir. 2009). Notice of claim requirements are strictly construed by New York state courts and failure to provide a notice of claim generally requires dismissal of a plaintiff's State law claims. *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999).

After receiving the Notice of Claim, the municipality may demand a 50-h hearing to examine the "claimant relative to the occurrence and extent of the injuries or damages for which claim is made." GML § 50-h. If a claimant fails to appear at the hearing or request an adjournment, the claimant is precluded from commencing an action against a municipality. *Id.*

Defendants argue that the State law claims fail because Plaintiffs never appeared for the 50-h hearing on April 5, 2011, after being granted four adjournments of the hearing. (Def 56.1 ¶¶ 39–46.) Based on the fourth request, the 50-h hearing was adjourned to April 5, 2011. About a week before that hearing, on March 28, 2011, Plaintiffs requested a fifth adjournment. (Bodner Aff.[25] ¶ 26.) Defendants did not respond to that adjournment request. (*Id.* ¶ 27.) No additional attempts were made by Plaintiffs to obtain an adjournment. (Pl. 56.1 ¶ 187.) On April 5, 2011, the 50-h hearing did not go forward because Plaintiffs failed to appear. (Bodner Aff. ¶ 29.) Plaintiffs' counsel did not contact the Comptroller to provide any explanation as to why they failed to appear at the 50-h hearing, nor did Plaintiffs seek to reschedule the 50-h hearing before the statute of limitations expired on May 7, 2011. (*Id.* ¶ 29–30.)

---

[25] Citations to "Bodner Aff." refer to Marilyn Bodner's Affidavit in Support of Defendants' Motion for Partial Summary Judgment. (Dkt. 32.)

However, under GML § 50-h(5), "If the claimant requests an adjournment or postponement beyond the ninety day period, the city . . . shall reschedule the hearing for the earliest possible date available." Here, Defendants did not respond to Plaintiffs' March 28, 2011 request for an adjournment, which was based on Crockett's medical condition. While Defendants are correct that courts have placed the burden on the claimant to resolve any discrepancies regarding the rescheduling of a 50-h hearing, courts have also excused noncompliance with 50-h in exceptional circumstances, such as extreme physical or psychological incapacity. *See Steenbuck v. Sklarow*, 880 N.Y.S.2d 359, 361 (2d Dep't 2009) ("Under the circumstances of this case, given the nature and extent of the plaintiff's injuries . . . the plaintiff's failure to appear for [] a [50-h] hearing does not warrant dismissal of the complaint."); *Legal Servs. Elderly, Disabled, or Disadvantaged of W. New York, Inc. v. Cnty. of Erie*, 3 N.Y.S.3d 497, 498 (4th Dep't 2015) (Detainee's failure to appear for examination requested by county did not warrant dismissal of his complaint seeking damages for injuries he sustained while in custody of county sheriff's department, where detainee was unable to appear at hearing because he sustained severe brain injury and was permanently incapacitated). Here, at the time of the 50-h hearing, Crockett was receiving ongoing treatment for the serious injuries he sustained after being shot by Officer Perez, and he requested an adjournment, to which the City did not respond. Under these circumstances, Plaintiffs' failure to appear for a 50-h hearing does not warrant dismissal of the complaint.[26]

---

[26] As discussed *infra*, the malicious prosecution claim has been dismissed, and the abuse of process claim will proceed to trial. Accordingly, the Court will only examine Mrs. Crockett's claims for loss of consortium and intentional infliction of emotional distress.

1.  Loss of Consortium

Defendants move for summary judgment dismissing Mrs. Crockett's cause of action for loss of consortium. (Def. Mem. 35–36.) "Under New York law, loss of consortium is not a claim for only lost household services, but is instead a more intangible yet more significant injury to the partner who suffers the loss of the relationship as it existed before the injury." *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 209 (2d Cir. 2010). As a result of the shooting, Crockett is permanently paralyzed from the waist down and has no control of his body or bodily functions below his waist. Mrs. Crockett, his wife, is now his caretaker, and it is unclear whether she is able to have an intimate physical relationship with him. The Court finds that there are genuine issues of material fact about whether Mrs. Crockett has presented sufficient evidence to establish a claim for loss of consortium. Accordingly, summary judgment on this claim is denied.

2.  Intentional Infliction of Emotional Distress

"Under New York law, to state a claim for intentional infliction of emotional distress, the plaintiff must show (i) extreme and outrageous conduct (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress, (iii) a causal connection between the conduct and injury, and (iv) severe emotional distress." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). The element of outrageous conduct is "rigorous, and difficult to satisfy" in order to "filter out trivial complaints and assure that the claim of severe emotional distress is genuine." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013). While the conduct alleged in the Amended Complaint, when viewed in the light most favorable to Mrs. Crockett, is sufficient to make out a claim for intentional infliction of emotional distress, the claim fails for the same reason that Plaintiffs' substantive due process claims fail, namely, that

Mrs. Crockett does not offer any evidence that any of the Defendant-Officers were personally responsible for intentionally causing severe emotion distress. The claim also fails against the City because it is "'well-settled that public policy bars intentional infliction of emotional distress claims against government entities.'" *Jones v. City of New York*, 988 F. Supp. 2d 305, 318 (E.D.N.Y. 2013) (quoting *King v. City of New York*, No. 12 Civ. 2344, 2013 WL 2285197, at *10 (E.D.N.Y. May 23, 2013)). Accordingly, Defendants' motion for summary judgment on this claim is granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment is denied in part, and granted in part. The parties shall proceed to trial on: (1) Plaintiffs' false arrest claim against Defendant-Officers Perez and Ambrosino; (2) the excessive force claim against Defendant-Officer Perez; (3) the federal and State law abuse of process claims against all Defendants; and, (4) the State law claim for loss of consortium against all Defendants. The parties will file their Joint Pretrial Order on 11/30/15.

SO ORDERED:


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: September 29, 2015
        Brooklyn, New York