11 CV 4378 (PKC)(RML)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JAMES CROCKETT AND THERESA CROCKETT,

Plaintiff,

-against-

CITY OF NEW YORK, POLICE OFFICER RAUL
PEREZ, POLICE OFFICER MATTHEW J.
AMBROSINO, POLICE OFFICER STEVEN BHAGAN
and LIEUTENTANT GREACIA HERDSMAN,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S POST-TRIAL BRIEF

ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street
New York, N.Y.  10007
Counsel: Ben Kuruvilla & Joshua J. Lax
Tel:  (212) 356-3513 / 356-3538

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 3

LEGAL STANDARD ......................................................................................... 3

LEGAL ARGUMENT ......................................................................................... 4

POINT I

THE VERDICT WAS CONSISENT WITH THE
EVIDENCE PRESENTED ................................................................. 4

A.   Plaintiff Offered No Explanation for How or
Why He Was Shot ................................................................ 6

B.   Version Credited by Jury ..................................................... 8

C.   No Evidence of Conspiracy ................................................ 11

D.   Plaintiffs' Expert is Contradicted by the
Medical Records and Photograpghs ................................... 12

POINT II

PLAINTIFF'S   VACUOIUS   CLAIMS   OF
"ATTORNEY   MISCONDUCT"   SHOULD   BE
REJECTED AS DEFENSE COUNSEL'S CONDUCT
WAS WELL WITHIN THE BOUNDS OF PROPER
ADVOCAY AND PLAINTIFF SUSTAINIED NO
PREJUDICE ...................................................................................... 13

A.   Admission of the Luna Interview Recording ..................... 13

B.   Plaintiffs' Counsel Succeeds in Having Part of
the   Defense   Closing   Struck,   Obtains   a
Curative Instruction, But Admits the Facts He
Complained of Initially ...................................................... 15

C.   Plainitff Lies to His Counsel and The Court ..................... 19

POINT III

DEFENSE COUNSEL DID NOT OFFER A NEW
THEORY   ON   SUMMATION,   AND,   IN   ANY

**Page**

EVENT, PLAINITFF DID NOT SUFFER ANY
PREJUDICE ..................................................................................................22

CONCLUSION ..................................................................................................21

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

Ellis v. La Vecchia, 567 F. Supp. 2d 601 (S.D.N.Y. 2008) ............................................5

Farrior v. Waterford Bd. of Ed., 277 F.3d 633 (2d Cir. 2002) ......................................4

Garcia v. City of New York,
11 CV 2284 (JBW) (JO), 2013 U.S. Dist. LEXIS 147149
(E.D.N.Y. July 17, 2013) ...............................................................................................5

Marcic v. Reinauer Transp., 397 F.3d 120
 (2d Cir. 2005)) ..............................................................................................................16

Marshall v. Randall, 719 F.3d 113 (2d. Cir. 2013)...............................................16, 17

Medforms, Inc. v. Healthcare Management Solutions, Inc.,
290 F.3d 98, 106 (2d Cir. 2002). ....................................................................................6

Metromedia Co. v. Fugazy,
938 F.2d 350 (2d Cir. 1992) ...........................................................................................4

Nimely v. City of New York, 414 F.3d 381 (2d Cir. 2005)) ...........................................3

Patterson v. Balsamico, 440 F.3d 104 (2d Cir. 2006) .................................................15

Readle v. Credit Argicole Inosuez, 670 F.3d 411
(2d Cir. 2012). ................................................................................................................6

Rehberg v. Paulk, 132 S. Ct. 1497 (2012) ...................................................................18

Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 271 (2d Cir. 1999) .......................15

Song v. Ives Labs, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)........................................3

**Statutes**

42 U.S.C. § 1983...........................................................................................................15

## PRELIMINARY STATEMENT

Plaintiffs James Crockett and Theresa Crockett, by their attorneys, commenced this action on or about September 12, 2011.  Plaintiff James Crockett alleged that defendants Police Officers Raul Perez, Steven Bhagan, Matthew Ambrosino and defendant Lieutenant Hersdman violated his federal constitutional and state common law rights.  Specifically, plaintiff James Crockett claimed that defendant Perez used excessive force against him on February 6, 2010 when Perez shot him.  Plaintiff James Crockett also claimed that he was falsely arrested and subjected to malicious abuse of process.   Trial in this matter began on October 24, 2016.  On October 31, 2016, the jury returned a verdict in favor of defendants on all counts.

On or about December 9, 2016, plaintiff moved this Court for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A) on the basis that the jury that the verdict for the defendants was against the weight of the evidence, that defense counsel allegedly engaged in "attorney misconduct" and on the grounds that Court allowed defense counsel to present a new theory during closing that unsupported by the evidence.  Defendants now submit the within Memorandum of Law in Opposition to plaintiffs' motion.

## LEGAL STANDARD

A Court may grant a motion for a new trial "if it is convinced that the jury had reached a seriously erroneous result or that the verdict is a miscarriage of justice." Song v. Ives Labs, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992) (citations omitted; internal quotations omitted).   Although the standard for granting a Rule 59 motion for a new trial is less restrictive than the Rule 50 standard, it remains high.  Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005). "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."

Medforms, Inc. v. Healthcare Management Solutions, Inc., 290 F.3d 98, 106 (2d Cir. 2002).  "In determining whether the jury's verdict is so 'seriously erroneous' as to justify a new trial, the trial judge is free to weigh the evidence."  Farrior v. Waterford Bd. of Ed., 277 F.3d 633, 634 (2d Cir. 2002).  Unlike the standard governing a Rule 50 motion, a court "may weigh the evidence and credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner."  Readle v. Credit Argicole Inosuez, 670 F.3d 411, 418 (2d Cir. 2012).  The court must, however, "exercise its ability to weigh credibility with caution and great restraint," and"[w]here the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."  *Id.* (quoting Metromedia Co. v. Fugazy, 938 F.2d 350, 353 (2d Cir. 1992)).  Rather, the Court must give deference to the jury's credibility determinations.  See e.g., Ellis v. La Vecchia, 567 F. Supp. 2d 601, 610 (S.D.N.Y. 2008) ("while the standard for granting a Rule 59(a) motion for a new trial is more lenient than that for granting judgment as a matter of law, it is still improper for the Court to grant a new trial when resolution of the issues depended on assessment of the credibility of the witnesses") (internal quotations and citations omitted).

## LEGAL ARGUMENT

### POINT I

### THE VERDICT WAS CONSISTENT WITH THE EVIDENCE PRESENTED

Plaintiffs argue that the jury's verdict was against the weight of the evidence and that, as such, he is entitled to a new trial under Federal Rule of Civil Procedure 59(a).  As discussed *supra*, a motion for a new trial pursuant to Rule 59 should ordinarily be denied "unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a

miscarriage of justice." <u>Garcia v. City of New York,</u> 11 CV 2284 (JBW) (JO), 2013 U.S. Dist. LEXIS 147149, *15 (E.D.N.Y. July 17, 2013).

In this case, plaintiffs are simply unhappy with the verdict. They believe that the jury got it wrong. But throughout the course of the six day trial, plaintiff and his capable attorneys had every opportunity to elicit evidence and testimony to support plaintiff's version of events. Plaintiffs' counsel had ample opportunity to cross examine each and every witness. The jury, having heard all of the testimony, including that from a non-party civilian witness, plaintiff James Crockett, a medical expert, police practices expert, the four defendants and a non-party police sergeant, all called in the plaintiff's case, found in favor of the defendants. The jury had an opportunity to consider all of the testimony and evidence and weighed the credibility of the witnesses. That they returned a verdict in favor of the defendants – that they disbelieved or did not give credence to plaintiff's version of events – does not mean that the verdict is against the weight of the evidence. Plaintiffs are now simply using the vehicle of this post-trial motion to reargue their case to the Court. The Court should, as it is required to do, exercise great restraint in making any credibility determinations, and should decline to set aside the jury's verdict.

In fact, the evidence presented at trial supported the jury's verdict rejecting plaintiffs' version of events. Plaintiffs' theory is that Police Officer Perez essentially shot plaintiff on the ground for absolutely no reason. Plaintiff James Crockett claims he posed no threat at the time he was shot and did not possess any weapon at the time he was shot. Despite this, plaintiff claims that Perez fired two shots, unprovoked, into plaintiff while he was unconscious or semi-conscious on the ground. As an initial matter, on its face, without even any presentation of evidence, this theory strains believability. Given this premise and then considering the evidence

and testimony that ultimately came in at trial, the verdict is not surprising and is consistent with the evidence.

### A. Plaintiff Offered No Explanation for How or Why He Was Shot

In their motion, plaintiffs left out a very important detail about the trial testimony. That is, that plaintiff James Crockett could offer no explanation for why or how he was shot. This means that plaintiff offered no version of events at trial for the most critical moment of his case. Although plaintiff denied at trial that he was drunk, he testified that he drank alcohol at three different bars for several hours. There was testimony that plaintiff made multiple trips to ATM machines that evening to get more money when he ran out of money from drinking. Although plaintiff disputed part of this characterization, the jury was presented with evidence from which it could draw the inference that plaintiff spent nearly $300 on drinks for a period of seven hours leading up to this incident. (Transcript of Civil Cause for Jury Selection and Trial, October 28, 2016, annexed to the Declaration of Ben Kuruvilla, Esq. ("Kuruvilla Decl."), Ex. A, 936:9-941:9). Plaintiff testified that after a number of hours of drinking, he left a bar called Vaquero. (Transcript of Civil Cause for Jury Selection and Trial, October 27, 2016, annexed to the Declaration of Ben Kuruvilla, Esq. ("Kuruvilla Decl.") at Exhibit "B" ("Ex. B"), at p. 879:6-9). Plaintiff said he was happy, with a little buzz like anyone following a "couple of drinks. (Ex. B at p. 879:10-17). Inexplicably, plaintiff turned off Myrtle Avenue where his bus stop was and onto Linden Street. (Ex. B at p. 879:20-880:3). On Linden Street plaintiff was grabbed from the back of his collar and pulled back into the position of a person playing limbo. (Ex. B at p. 880:6-18). Although he claims he was not drunk, the amount of alcohol plaintiff consumed made him unable to fight the assailant off. (Ex. B at p. 880:10-18). Plaintiff started screaming for help. (Ex. B at p. 880:19-24).

The next thing plaintiff could remember at trial was a gun dropping to the ground. (Ex. B at p. 880:25-881:11). Plaintiff next passed out and could not remember anything past that point. (Ex. B at p. 881:16-18). His last recollection is struggling with the other man. (Ex. B at p. 881:19-21). Plaintiff's next recollection was feeling beaten and exhausted, unable to get up, and a police officer or some kind of authority coming near. (Ex. B, at p. 881:22-882:5. Plaintiff was unsure if he was in handcuffs. (Ex. B at p. 882:5-6). After seeing this individual, plaintiff said "please call my wife." (Ex. B at p. 882:12-18). The next thing plaintiff remembered was being wheeled into Elmhurst Hospital. (Ex. A at p. 981:25-982:21).

On cross-examination, plaintiff stated he had no memory of any events that occurred between his passing out during the struggle and waking up on the ground. (Ex. B at p. 905:5-906:12). Plaintiff admitted that the air pistol (Defendant's Exhibit "B" in evidence) was found near his body on the night of the incident. (Ex. B at p. 908:1-909:6). The jury was also presented with plaintiff's deposition testimony wherein plaintiff stated that he was drunk, and that condition caused plaintiff to pass out. (Ex. A at p. 978:9-13). Plaintiff also changed his testimony as to whether the air pistol was planted at the scene of the incident. (Ex. A, at p. 981:4-24).

Notably, although plaintiff claims he never got back up and stood on his feet after he passed out, the jury was presented with plaintiff's deposition testimony on cross-examination wherein he admitted that he could not be certain whether he got up or not. (Ex. A., 977:17-979:2.) Given that the jury heard testimony and received evidence that plaintiff had no recollection of the circumstances of when he was shot, that he admitted the air pistol was found near him, that he drank nearly $300 worth of alcohol leading up to the incident and could not

state with certainty whether he got up after he allegedly passed out, it was certainly possible that the jury essentially dismissed plaintiff's entire theory of the case.

In the face of plaintiff's obviously weak testimony in support of his case, plaintiff still argues that the verdict was against the weight of the evidence.   Plaintiff argues that the "objective", "credible" evidence at trial supports his version of events - that plaintiff was shot on the ground.   In support of his argument, plaintiff points to alleged inconsistencies in the defendants' testimony – specifically between Herdsman's testimony and the other defendants' testimony.   However, upon closer examination it is clear that there are no material inconsistencies in the testimonies, and, at the very least, there is no inconsistency on the main point of contention – that plaintiff was on the ground when he was shot.   Plaintiff's argument fails to consider that the jury considered all the testimony before it and simply credited defendants' version over plaintiff, including after a full consideration of all the alleged inconsistencies that plaintiffs highlight in their motion.     Further, none of these alleged inconsistencies establish or even intend to show that plaintiff was on the ground when he was shot – which was plaintiff's theory of the case.     The jury was presented with the following testimony from officers Ambrosino and Perez about the shooting incident:

**B.        Version Credited By Jury**

Plaintiff pointed a gun at Officer Ambrosino, causing Officer Perez, under the belief his partner was about to be shot, to shoot plaintiff.  (Transcript of Civil Cause for Jury Selection and Trial, October 26, 2016, attached as Exhibit C at p. 650:5-10).   When Officer Perez first saw plaintiff, he saw the butt of a gun in plaintiff's left jacket pocket.   (Ex. C at p. 650:19-21).   Officer Ambrosino saw the gun as well.  (Transcript of Civil Cause for Jury Selection and Trial, October 25, 2016, attached as Exhibit D to Kuruvilla Declaration at p. 425:65-14).  Both officers

yelled the word "gun" to the other to alert each other to the firearm.  (Ex. D at p. 425:9-11; Ex.C at p. 651:18-22).  Both officers drew their weapon.  (Ex. D at p. 425:11-12; Ex. C at p. 652:18-653:2).  Plaintiff was told "Police, don't move."  (Ex. D at p. 425:11-13; Ex. C at p. 652:18-653:2).  Plaintiff pulled the gun out of his jacket.  (Ex. D at p. 425:12-14; Ex. C at p. 652:18-653:2).  The officers ordered plaintiff to drop the gun.  (Ex. D at p. 425:13-14; Ex. C at p. 652:18-653:2).  Plaintiff turned and pointed the gun at Officer Ambrosino.  (Ex. D at p. 425:18-21; Ex. C at p. 653:5-8).  Officer Perez believed at that moment plaintiff would kill his partner and fired two shots.  (Ex. C at p. 652:18-653:2).  Plaintiff was standing at the time he had the gun.  (Ex. D at p. 433:8-12; Ex. C at p. 653:13-17).  Plaintiff was standing at the time Officer Perez fired his weapon.  Ex. C at p. 663:11-13).

Plaintiffs argue that Lieutenant Herdsman's testimony conflicts with the officers' testimony.  In fact, Herdsman's testimony does not conflict with the officers' testimony in any material respect – including on the point that plaintiff was standing when he was shot.  Herdsman did not arrive at the scene with the other defendant officers.  Instead she arrived separately and from the opposite direction. (Ex. C at p. 536:4-21).  Notably, as plaintiffs note, as Herdsman exited her vehicle, she heard the second shot.  (Ex. C at p. 536:4-21; 540:2-7).  Accordingly, the jury heard clear, unrefuted testimony that the shooting was over by the time Herdsman fully exited her vehicle.  Plaintiff cites to Herdsman's testimony that she saw no civilians as she was heading up to the location where she saw the officer.  (Ex. C at p. 536:4-; 540:7).  However, to the extent plaintiffs are arguing that this is evidence that plaintiff was not standing when he was shot, plaintiffs fail to account for the fact that the jury heard testimony that plaintiff had already been shot twice (and so had fallen) by the time Herdsman approached.  (Ex. C at p. 536:4-21; 540:2-7).  To the extent plaintiffs are arguing that Herdsman did not see

civilians on the sidewalk as she pulled onto Linden Street in her vehicle (and this is not at all clear from the trial testimony (see Ex. D at p. 536:4-540:7), plaintiffs fail to account for the fact that the jury heard that Herdsman was seated in a vehicle when she initially turned onto Linden, that the jury also saw photos admitted into evidence showing vehicles parked along Linden on the night of the incident that would have impacted Herdsman's view and that her view was directed on Officer Perez, who she described as standing in the street with his weapon in his hand. (Ex. D at p. p. 523:12-524:22; 536:4-11). Plaintiffs fail to account for the fact that the jury considered all of this evidence in reaching its ultimate verdict.

Plaintiffs also cite to a portion of Herdsman's testimony where she indicates she did not see anyone else approach the weapon as she approached it. (Ex. D at p. 547:1-23; 549:9-17) However, Herdsman's testimony was clear that by the time she reached the weapon, it was already broken into pieces. (Ex. D at p. 547:20-548:22-24). Ambrosino and Perez testified that after plaintiff was shot, Ambrosino approached plaintiff and kicked the gun from his hand, causing it to hit a wall and break. (Ex. C at p. 374:19-375:7, 442:18-20). Accordingly, the jury could have inferred from these testimonies that, since the air pistol was broken when Herdsman came upon it, Ambrosino had already kicked it into a wall, and therefore Herdsman simply did not see Ambrosino in the area at the time. In fact, Ambrosino testified that although Herdsman was present after the shooting, he did not speak to her. (Ex. C at p. 375:14-18).

None of the testimony plaintiff cites as alleged inconsistencies between Herdsman and the other officers reflect any support for plaintiff's version of events that he was shot on the ground. Plaintiff seems to argue that any inconsistency, no matter how minor, is indication that the jury's verdict was against the weight of the evidence. This is not an accurate understanding of the Rule 59 standard. To the extent there were minor inconsistencies, they do not rise to a

level that reflects the jury's verdict was against the weight of the evidence.   The jury considered all the testimony and simply did not credit plaintiff's version.  This does not warrant a new trial so plaintiff can get a second bite of the apple.

### C.  No Evidence of Conspiracy

Plaintiffs allude to the fact that defendants Perez, Ambrosino and Baghan had "ample opportunity to concoct their story" because they traveled in a van to the hospital and met with union representatives.   See Plaintiff's Motion at p. 6.  Plaintiff is here simply making the argument that he made to the jury at closing.   The jury rejected it.  Moreover, there was evidence contrary to plaintiff's theory that the officers "concocted", or conspired to create, their story.  Plaintiffs called Sergeant George Duffy, and offered into evidence an audio-recording of Sergeant Duffy's interview with police department investigators.  (Transcript of Civil Cause for Jury Selection and Trial, October 27, 2016, Exhibit E at p. 738:17-741:5).   Sergeant Duffy explained that when he arrived at the scene of the shooting, he separated Officer Perez, Officer Ambrosino, and Officer Bhagan from each other and interviewed them briefly, each on their own. (Ex. E at p. 754:23-756:3).  After those initial conversations with each officer, the sergeant had no further discussions regarding the incident.  (Ex. E at p. 756:4-7).   Sergeant Duffy explained that after he received a brief synopsis from each officer, the Internal Affairs Bureau and the Brooklyn District Attorney would take over the investigation so he could not speak to the officer beyond the initial synopsis.  (Ex. E at p. 758:8-19).   Accordingly, the jury heard testimony that the officers spoke separately to a supervisor at the scene immediately after the incident and before they went to the hospital.   Moreover, as the plaintiff cited, there were some minor discrepancies between the versions of events told by Bhagan, Perez and Ambrosino,

which would not be consistent with a "concocted" story.  See Plaintiff's Motion at p. 4-5.  All of this undercuts the plaintiff's theory of conspiracy and the jury agreed.

### D. Plaintiffs' Expert Is Contradicted by the Medical Records and Photographs

Plaintiff also argues that his medical expert, Dr. Allan Miller's, testimony established that plaintiff was shot on the ground.  However, this expert was cross-examined on the conclusions that form the basis for his opinion.  Plaintiff presented Dr. Miller's testimony in an effort to establish that plaintiff was on the ground at the time he was shot.  To support his theory, Miller testified that one of the bullets entered by the left nipple at the same place a chest tube was later inserted.  (Ex. A at p. 1053:4-14).  Miller did not make any opinion as to the trajectory of the bullet that entered at the hip.  (Ex. A at p. 1077:3-25).  The photographs of the two bullet wounds plaintiff sustained were apparently in different places other than the area of the left nipple, and depicted circular wounds.  (Ex. A at p. 1054:2-13).  The scar from the chest tube is a horizontal line and four dots.  (Ex. A at p. 1055:10-13).  The placement of the bullet wound in the photo of torso chest area was different from the placement of the chest tube wound.  (Ex. A at p. 1098:23-1100:3).

During the cross-examination of Miller the jury was presented with portions of plaintiff's medical records, and in particular radiological reports, that describe the location of various metallic fragments in both the area of the chest and the pelvis.  (Ex. A at p. 1039:1 – 10:40:25).  These reports made clear for both the chest wound and the hip wound, bullet fragments were located going across plaintiff's body from left to right, with a large bullet fragment resting somewhere on the right side of the body.  (Ex. A at pp. 1082:5-1094:24, 1102:5-1115:11, 1119:13-1120:20; Ex. E).  This objective medical evidence obviously contradicts Dr. Miller's theory of a downward trajectory and instead supports the theory that the

bullet entered plaintiff's left side and travelled left to right across his body.   To escape this reality, Miller proposed that the large fragment in the right hip travelled upward to the right low chest and damaged the right lung and right ninth rib.   (Ex. A at p. 1121:14-1124:23).   This was somehow possible despite plaintiff suffering two collapsed lungs from the bullet wound to the chest. (Ex. A at p. 1123:4-7).   The cross examination of Dr. Miller's conclusions, along with the objective medical reports and evidence, rebut Dr. Miller's opinions and the jury considered all of this evidence in reaching its verdict.

## POINT II

### PLAINTIFF'S VACUOUS CLAIMS OF "ATTORNEY MISCONDUCT" SHOULD BE REJECTED AS DEFENSE COUNSEL'S CONDUCT WAS WELL WITHIN THE BOUNDS OF PROPER ADVOCACY AND PLAINTIFF <u>SUSTAINED NO PREJUDICE</u>

Knowing full well that the jury verdict was consistent with the evidence and testimony at trial, in desperation, plaintiff cites to the alleged "egregious misconduct" of defense counsel as an alternative theory for obtaining a new trial.   The Court should reject this argument.   The "conduct" that plaintiff cites to was (1) a line of questioning to non-party witness Petra Luna that was, in fact, a proper subject for cross-examination and (2) certain argument during summation regarding Luna that was also proper.   In any event, plaintiff cannot show that he sustained any prejudice from this alleged conduct because plaintiff had the opportunity to cure any harm he claims occurred because of this conduct.

#### A. Admission of the Luna Interview Recording

First, plaintiffs cite to the cross-examination of Petra Luna. At trial, Petra Luna testified that the last time she saw plaintiff, the gun was lying four or five feet from plaintiff.   (Ex. B at p. 850:7-10).   Defendants offered portions of a recorded interview where Luna was under oath to

tell the truth to impeach this testimony.  (Ex. B at p. 850:11-852:23).  Plaintiffs did not object to the admission of these portions of the recording.  (Ex. B at p. 851:25-852:4).  Luna admitted that she was asked in the interview how many inches the gun was from plaintiff.  (Ex. B at p. 854:21-856:13).  Luna admitted she said yes to a question that the gun was five inches from plaintiff.  (Ex. B at p. 856:14-15).

Plaintiffs claim that counsel made himself a witness when he noted that Luna gave a "si," or "yes," answer to the question of whether the gun was less than five inches from plaintiff when she last saw it (this conflicted with her trial testimony that the gun was four to five feet from plaintiff when she saw it).   Luna later claimed during cross-examination that the question about the distance during the audio interview was "confusing."  Plaintiff goes on to argue that Ms. Luna claimed to have issues with the Spanish used by the detective on the audio.

On redirect examination, however, plaintiffs had an opportunity to seek clarification from Luna about her assertion that she was asked a confusing question about the of the gun from plaintiff.  (Ex. B at p. 857:5-10).  She explained she might not have heard the question.  (Ex. B at p. 857:5-10).  She next claimed under questioning from plaintiffs' counsel that she didn't understand a lot of the questions she was asked, though no example was provided beyond the vague statement that the person translating did not use "good Spanish."  (Ex. B at p. 859:18-860:16).  Accordingly, any issues plaintiff had with defense counsel questioning of Ms. Luna was clarified on her redirect examination.  Furthermore, defense counsel's impeachment of Luna was completely proper and appropriate given that her trial testimony on direct contradicted wither her prior statement.  In any event, Luna admitted that she gave the answer of "five inches" during her audio interview, which is what defense counsel asked her, so there was no prejudice to plaintiff from defense counsel's question.

Notably, other parts of Luna's testimony called into question her credibility and also undercut plaintiff's theory that he was shot on the ground.  Specifically, Luna described seeing a gun drop to the ground between plaintiff and the other man, and a moment later, a man she described as the Mexican started hitting plaintiff in the head.  (Ex. B at p.  809:1-10).  When plaintiff was on the ground, the Mexican only retrieved his hat.  (Ex. B at p. 820:9-18).  The Mexican man left the gun at the scene.  (Ex. B at p. 820:17-20).  Luna testified that when plaintiff was on the ground, the left side of his body was facing a building, and the right side of his body was facing the street.  (Ex. B at p. 806:3-24).  This was the last position she saw plaintiff in.  (Ex. B at p. 806:25-807:5).  This testimony actually undermines plaintiff's theory that he was shot on the ground, since the left side of plaintiff's body was facing away from the street and toward the building, while his right side was exposed to the officers in the street. Since the medical records show that the bullet went through the left side of plaintiff's chest, Luna's testimony would undermine the theory that plaintiff remained on the ground when the police arrived.  Further, Luna was impeached with her deposition testimony that she would not have been able to see plaintiff if he stood up from the ground after she reversed her car.  (Ex. B at p. 840:22-847:7).

### B. Plaintiffs' Counsel Succeeds in Having Part of the Defense Closing Struck, Obtains a Curative Instruction, But Admits the Facts He Complained of Initially

Plaintiffs next argue that defense counsel engaged in misconduct during summations. See Plaintiff's Memo at p. 14.   The summation given by defense counsel was entirely appropriate. In light of the broad discretion this Court affords trial courts in managing opening statements and summations, this Court should reject plaintiff's effort to obtain a new trial based on summations.

As with evidentiary rulings made during trial, the Second Circuit has noted that any alleged errors made with respect to summations are reviewed for abuse of discretion and the Court will only reverse "'if an erroneous ruling affected a party's substantial rights'" Marshall v. Randall, 719 F.3d 113, 116 (2d. Cir. 2013), (quoting Marcic v. Reinauer Transp., 397 F.3d 120, 124 (2d Cir. 2005)).  Attorneys are given "'wide latitude in formulating their arguments' to the jury; 'rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.'" Patterson v. Balsamico, 440 F.3d 104, 119 (2d Cir. 2006) (citing Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 271 (2d Cir. 1999)).

In Marshall, a malicious prosecution case involving officers who claimed to see a witness throw away a firearm, plaintiff's repeatedly said in his summation that the officers had lied before the grand jury when they testified to seeing the suspect disposing of the firearm.  This conflicted, in part, with testimony they gave during trial. *Marshall*, 719 F.3d at 116.  These questions were highly improper in light of Supreme Court precedent stating that grand jury testimony is not admissible because officers are absolutely immune under 42 U.S.C. § 1983 in relation to grand jury testimony. *Id.* (citing Rehberg v. Paulk, 132 S. Ct. 1497 (2012)). While the Court held that such evidence might be admissible for impeachment purposes, counsel in Marshall went far beyond that limited exception, seeking to persuade the jury that the alleged lies before the grand jury were evidence in support of a malicious prosecution claim. See id. at 117. Plaintiff's counsel could not have been clearer in his effort to present his argument on the grand jury testimony as being based on actual trial evidence: "You [the jury] can send a message through your verdict . . . to any other police officer out there that thinks it's okay to get in front of a grand jury and lie." Id. And, of course the prejudicial impact of such a "factual" claim would

have been overwhelming in terms of making jurors believe that the officers had committed malicious prosecution.

Nevertheless, the Court did not find the admission of this clearly improper argument to be an abuse of discretion. This was because the Court had given the instruction, "'defendants cannot be liable for what he said to the grand jury,' and that '[t]he openings and closings are not evidence.'" Id.   In light of the highly prejudicial nature of the remarks of plaintiff's counsel in Marshall, it is clear that plaintiff must meet a high bar in obtaining a new trial on account of the defense summation. He has utterly failed to reach that bar.

It was not only not objectionable, but entirely reasonable, for defense counsel to point to testimony and other evidence that called into question plaintiff's story.  During the defense closing, defendants suggested that one of plaintiff's counsel met with Petra Luna in the hallway with the retained translator to discuss her testimony prior to her taking the stand, and that this discussion led Luna to change her testimony from her interview with investigators and her deposition.  (Transcript of Civil Cause for Jury Selection and Trial, October 31, 2016, annexed to the Declaration of Ben Kuruvilla, Esq. ("Kuruvilla Decl.") at Exhibit "F" ("Ex. F"), at p. 1293:20-1294:20).

Plaintiffs requested a sidebar and, during the sidebar on this point, the Court agreed to strike the last part of the argument, and to give a curative instruction.  (Ex. F at p. 1297:10-22).  The Court did advise defense counsel that he could reference the fact that plaintiff called Luna, and that witnesses could be coached during preparation to say things differently. (Ex. F at pp. 1296:6-14, 1297:23-1298:2).  The Court next gave the following instruction to the Jury:

> THE COURT: Ladies and gentlemen, I'm going to strike the last part of the argument by [counsel] about the lawyers for the plaintiff going in the hallway,

and which you should not consider in any way. What the lawyers did with respect
to preparing for their cases is of no concern to you. So just disregard that part of
the argument, and, again, this is merely argument. So I want you to focus on the
facts and the argument that [counsel] makes based on how you should interpret
the facts that you saw and heard in this courtroom.

(Ex. F at p. 1298:5-13).  Defense counsel continued within the parameters set by the Court.  (Ex.

F at p. 1298:16-22).  Plaintiff made no objection to this argument.  (Ex. F at p. 1298:16-22).

Despite the relief plaintiffs received from the Court, and that the argument was

struck, plaintiffs' counsel nonetheless discussed it in his rebuttal:

First, I will address the fact that there was a claim that something was done wrong
with Ms. Luna, by Ms. Harris-Marchesi or myself. I will address that. Why?
Because that just goes to show what they have not learned, how deep it will even
go to just simply try and make everybody else wrong when they know darn well
they're wrong. That speaks volumes to why in this situation their credibility is
going down the tube with the biggest sucking sound I can hear.

(Ex. F at p. 1315:11-18).  Plaintiffs' returned to this again, this time admitting his co-counsel did

go into the hallway but offered an excuse:

And the fact that he would talk about Ms. Luna, and claim that somehow someone
convinced that lady, who came here and didn't have to come here, who came here
to tell the truth about what she saw that night, and spoke based on her memory as
best she could that somehow someone convinced her to do something wrong, **or
that myself, or Ms. Harris-Marchesi went into the hallway, that she
disappeared -- ladies and gentlemen, you got to go to the bathroom,
sometimes you go to the bathroom,** but the witness was in here, and somehow
there's something wrong.

(Ex. F at p. 138:7-16)(emphasis added).

As an initial matter, defense counsel's summation was proper.  Counsel asked the jury to

infer facts based upon what happened at trial.  Moreover, given that plaintiffs' counsel admitted

in rebuttal that the facts which defense counsel raised in summation – that the witness left the

courtroom and so did Ms. Harris-Marchesi – did in fact occur, defense counsel did nothing

improper in making the argument which referenced what factually occurred during the trial.

Further, any speculative harm plaintiff claims occurred was cured by the Court's instruction, and plaintiffs chose to revisit the issue anyway during summation. While plaintiffs argue that the Court then did not address the issue again during jury instructions, plaintiff had an opportunity to review the Court's proposed instructions and also had an opportunity to request such an instruction during the jury charge conference, but plaintiffs made no such request. Accordingly, plaintiffs are hard-pressed to argue that they were not given an opportunity to cure whatever prejudice they claim occurred because of defense counsel's argument. In fact, the judge did give an instruction during trial immediately after plaintiff's sidebar request. Further, the Court instructed the jury that summations are not evidence. Clearly, plaintiff sustained no harm or prejudice.

### C.  Plaintiff Lies to His Counsel and The Court

If anything, the "egregious conduct" that occurred during this trial came from plaintiffs. During plaintiffs' direct examination of defendant Matthew Ambrosino, plaintiff's counsel focused Officer Ambrosino's attention on a man in video footage from a convenience store with the suggestion that this person was plaintiff, and Officer Ambrosino agreed. (Ex. D at pp. 328:5-330:11, 331:21-332:20). Plaintiff's counsel went on to question the officer about the man in the video purchasing coffee and appearing sober on the video. (Ex. D at pp. 334:13-25, 336:3-16). Later testimony by this witness revealed that the individual initially noted to be plaintiff was incorrect, and that plaintiff appeared later in the footage in the exhibit. (Ex. C, at p. 474:7-497:25). The individual plaintiffs' counsel asked about had a large build, a square crew cut and a leather jacket and dark pants. In the video, plaintiff is seen wearing glasses, a dark sweater with a stripe, and light colored pants and dark shoes. A receipt received in evidence as

Plaintiff's Exhibit 43 confirmed that plaintiff used the ATM, as shown in the video. (Ex. C at p. 486:14-489:25).

During a colloquy on plaintiffs' counsel's good faith basis for suggesting the other individual was plaintiff in the video, plaintiffs' counsel stated that that the man they asked about was in fact plaintiff. (Ex. C at p. 389:20-390:8). In response, the Court asked plaintiffs' counsel if plaintiff was going to testify he encountered defendants earlier in the night. (Ex. C at p. 390:1-3). Plaintiffs' counsel spoke to plaintiff, and informed the Court that plaintiff believed that the wrong man was in fact himself in the video. (Ex. C at p. 390:9-14). Plaintiff testified that at the time of the incident he was wearing a Nautica jacket that was reversible with a dark gray and a navy blue side, a brown sweater with a stripe across it, olive green pants and black Timberland boots. (Ex. B at p. 897:17-22). Thus, plaintiff's statement to his lawyer that he was the one depicted buying coffee in the video footage as opposed to the man using the ATM was false based on his own testimony as to how he was dressed. Conversely, if plaintiff was not dressed in this manner and genuinely believed himself to be the other man, he lied regarding how he was dressed.

## POINT III

### DEFENSE COUNSEL DID NOT OFFER A NEW THEORY ON SUMMATION, AND, IN ANY EVENT, PLAINTIFF DID NOT SUFFER ANY PREJUDICE

Finally, plaintiffs' counsel argues that defense counsel offered a new theory in closing arguments that was not previously raised because defense counsel noted that Officer Perez would be entitled to use force if plaintiff had pointed a gun at him. This is not true and defense counsel acted properly. Defense counsel did not state facts that were not in the record. Defense counsel did not affirmatively state that the evidence showed that plaintiff pointed a gun while lying on

the ground.   Instead, defense counsel used the latitude offered in closing argument to emphasize

the fact that Officer Perez was entitled to use deadly force if plaintiff was pointing a gun – and

that would be true even if plaintiff had been pointing a gun when lying on the ground.   This type

of argument is well within the discretion afforded to counsel in making closing arguments.   In

any event, plaintiffs sustained no prejudice.   Plaintiffs had opportunity to address this alleged

"new theory" in rebuttal.   If plaintiffs felt that defense counsel's summation proposed a new

theory, plaintiff was free to argue that the evidence or testimony which came in at trial was

different from this "new theory."   Accordingly, plaintiffs were not prejudiced by defense

counsel's closing arguments, which were proper.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court deny plaintiffs'

post-trial motion.

Dated: New York, New York
     February 3, 2017

                       ZACHARY W. CARTER
                       Corporation Counsel of the
                         City of New York
                       *Attorney for Defendants*
                       100 Church Street
                       New York, New York 10007
                       (212) 356-3538

                     By:       /s/
                           Ben Kuruvilla
                           Joshua Lax
                           *Senior Counsel*

cc:    **VIA ECF**
       All Counsel