UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

JAMES CROCKETT & TERESA CROCKETT,

                        Plaintiffs,

                                                    **MEMORANDUM & ORDER**
             v.                                      11-CV-4378 (PKC) (RML)

THE CITY OF NEW YORK, POLICE OFFICER
RAUL A. PEREZ (Shield No. 2957), in his individual
and official capacities; POLICE OFFICER MATTHEW
J. AMBROSINO (Shield No. 1211), in his individual
and official capacities; POLICE OFFICER STEVEN
BHAGAN (Shield No. 13662), in his individual
and official capacities; LIEUTENANT GREACIA
HERDSMAN (ID No. 901687), in her official and
individual capacities; JOHN AND JANE DOES
POLICE OFFICERS & DETECTIVES 1-8, in their
individual and official capacities,

                        Defendants.

--------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

    Plaintiffs James and Teresa Crockett ("Plaintiffs") brought this suit under 42 U.S.C.

§ 1983, alleging that New York City Police Department ("NYPD") Officers Raul A. Perez,

Matthew J. Ambrosino, and Steven Bhagan, and NYPD Lieutenant Greacia Herdsman[1] used

excessive force against Plaintiff James Crockett ("Plaintiff"),[2] falsely arrested him, and subjected

him to malicious abuse of process.   On October 31, 2016, after a six-day trial, the jury returned a

verdict in favor of Defendants Perez, Ambrosino, Bhagan, and Herdsman on all counts.

---
    [1] No John or Jane Doe Officers were ever identified in this action.

    [2] Although James and Teresa Crockett are both plaintiffs in this action, the Court's
references to "Plaintiff" refer to James Crockett.

1

Plaintiffs now move for a new trial pursuant to Federal Rule of Civil Procedure ("FRCP") 59(a) ("Rule 59"), alleging that the verdict was against the weight of the evidence, that defense counsel Joshua Lax engaged in attorney misconduct, and that the defense presented a new theory during closing arguments that was not supported by the evidence. For the reasons set forth below, Plaintiffs' motion is denied.

## BACKGROUND

The Court assumes the parties' familiarity with the trial record and procedural history in this case, and discusses them only to the extent they are relevant to the resolution of the instant motion.

## I. EVIDENCE AT TRIAL

### A. Factual Overview

It is undisputed that shortly after 1 a.m. on February 6, 2010, Defendant Raul Perez shot Plaintiff James Crockett, paralyzing him. The parties largely dispute the other circumstances surrounding the shooting.[3] Plaintiff testified that he was traveling home after a night of socializing at neighborhood bars, when someone attacked him. While he was struggling with the attacker, a gun fell to the ground from the attacker's person. Plaintiff thereafter passed out, and when he came to, he was unable to get up, and was being handcuffed by the police. He contends that he never pointed a gun at the police, and that the police shot him while he was lying on the ground after the attack. Defendants testified that Plaintiff was standing and pointing a gun at them when Perez shot him. The only non-party fact witness, Petra Luna, testified that she saw one man hitting

---

[3] In contrast to the standards governing a motion for judgment as a matter of law under FRCP 50, a court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner" when considering a Rule 59 motion. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

another man, a gun dropped, and then the first man walked away, leaving the other man lying on the ground. She then saw the police arrive and shoot at where the man on the ground had been, although she no longer had a clear view after reversing her car. Plaintiffs' medical expert opined that the trajectory of one of the two bullets that entered Plaintiff's body was consistent with Plaintiff having been shot while lying on the ground by someone several feet away, but he conceded other facts that weakened this conclusion.

### B. Plaintiff's Evidence

#### 1. Plaintiff's Testimony

On February 5, 2010, Plaintiff left work at 5:00 p.m., and stopped at a bar called Celtic Gasthaus, where he had a couple of pints of beer. (Tr. 867–69.)[4] After chatting with people and eating some bar food, he called his wife to say he would be out for a while. (Tr. 869.) He walked to Bushwick to go to a Latin bar called Casablanca to listen to Spanish music. (Tr. 869–70.) When he arrived at Casablanca, he spoke with the bartender and had a couple of beers. (Tr. 870.)[5] Because there was no music there, he left and went to another Spanish bar, Vaqueros, where music was playing. (Tr. 870) He arrived at Vaqueros around 10:00 p.m. (Tr. 871.) At Vaqueros, Plaintiff had "some" beers and "maybe a rum and coke or two." (*Id*.) He left Vaqueros close to 1:00 a.m., intending to head home. (*Id*.)

Plaintiff acknowledged making five or six ATM withdrawals over the course of the evening. (Tr. 872.) He spent some of the money on alcohol, but also needed to bring home money to pay for groceries and dry cleaning. (*Id*.) Plaintiff submitted bank records documenting these

---

[4] On cross-examination, Plaintiff admitted that he had two shots of liquor at this bar as well. (Tr. 919.)

[5] On cross-examination, Plaintiff admitted having some rum and Cokes as well. (Tr. 921.)

3

withdrawals. (Tr. 874–77.)[6] Plaintiff testified that when he left Vaqueros, he was "happy" and had "a little buzz on . . . [l]ike anyone, couple of drinks." (Tr. 879.) He "wasn't staggering . . . wasn't drunk." (*Id.*)

When Plaintiff left Vaqueros, he turned onto Linden Street, traveling from Myrtle Avenue toward Wyckoff Avenue. (Tr. 880.) He was then "grabbed from the back of [his] collar" and "pulled back." (Tr. 880.) Because he had been drinking alcohol, he was unable to fight the man off, although he stated that he was not in a state of "total inebriation." (*Id.*) He was drunk to the point where he could not defend himself. (Tr. 949.) The man pulled Plaintiff back into a limbo position, and Plaintiff could not break free. (Tr. 880.) The man said in a Hispanic accent "I'm not gonna let you go." (Tr. 952.) Plaintiff started screaming for help, and then a gun dropped from somewhere on the assailant's person. (Tr. 880–81.) Plaintiff was afraid, and did not pick up the gun. (Tr. 881.) At that point, he "totally passed out." (Tr. 881.) The last thing he remembered was struggling with the man. (*Id.*)[7]

The next thing Plaintiff remembered was trying several times to get up but being unable to do so. (*Id.*) He "was literally beaten and exhausted from the experience that [he] fell down then." (Tr. 882.) Plaintiff next was aware of a police officer or some kind of authority coming to him,

---

[6] When defense counsel asked Plaintiff on cross-examination whether he drank close to $300-worth of alcohol that night, based on the amount of money withdrawn from ATMs, Plaintiff stated that he had not, and explained that he had bought rounds of drinks for people in all three bars. (Tr. 944.) He also stated on direct examination that his attacker must have taken some of his remaining money while he was "blacked out." (Tr. 883.)

[7] Plaintiff testified on cross-examination that the pistol recovered from the scene was different from the pistol that dropped from the person who mugged him, and that he did not know how the pistol recovered at the scene got there. (Tr. 909.) He acknowledged previously alleging that the police had planted the gun on him. (Tr. 981.)

and he was either in handcuffs or "whatever the case." (*Id.*) He told someone to call his wife. (*Id.*) At that point, he could not get up. (*Id.*)

Plaintiff's clothes were covered in blood. (Tr. 884.) The next thing he clearly remembered was being wheeled into Elmhurst Hospital. (*Id.*)[8] He was "full of blood . . . dripping" and was "just bleeding out" from his left side. (Tr. 885.) Plaintiff testified that he still had markings at the time of his testimony—a bullet wound on his left hip, and another one under his left arm, below the armpit. (Tr. 886.) Plaintiff has not been able to walk since February 6, 2010. (Tr. 892.)

At the hospital, Plaintiff was shackled to gurneys and hospital beds, and had a police officer outside his door from February 6 to 25, 2010. (Tr. 889–90.) Plaintiff was thereafter charged with menacing a police or peace officer, and selling or possessing an air pistol or air rifle. (Tr. 894.) The charges were eventually dismissed. (Tr. 896.)

On cross-examination, defense counsel played security video footage from an On-the-Run gas station mini-mart where Plaintiff had withdrawn money at around 11:00 p.m. on February 5. (Tr. 958–67; Def.'s Exhibit G.) Plaintiff acknowledged having trouble with the ATM machine while making a withdrawal at the mini-mart, but denied that it was because was intoxicated. (Tr. 962–67.)

Plaintiff also testified that he had never owned a gun, that the air pistol in evidence was not his, and that he never pointed a gun at police officers on February 6, 2010. (Tr. 866, 883, 901.) On re-direct examination, Plaintiff testified that he is right-handed. (Tr. 996.)

---

[8] On cross-examination, Plaintiff admitted to having testified at his deposition that he believed he was tied up with electrical tape at the scene and thrown into the back of a dirty van. (Tr. 953–54.) He stated that he made that statement in his deposition because he "was traumatized in [his] mind" and that his "mind was running amuck based on what had happened to me." (Tr. 954.) He added, "my mind has played tricks on me." (Tr. 955.)

## 2. Defendant Officer Matthew Ambrosino's Testimony

Officer Ambrosino testified that on the night of February 5, 2010, he was driving a police van while on patrol with Officers Perez and Bhagan. (Tr. 322.) Ambrosino and his partners received a radio run, and they turned onto Linden Street, going the wrong way on the one-way street, from Wyckoff toward Myrtle Avenue. (Tr. 348–49.) Ambrosino told Bhagan to get out of the vehicle and travel down the sidewalk on the White Castle-side of the street.[9] (*Id.*) According to Ambrosino, Linden Street was illuminated by street lights. (Tr. 349.)

Officer Ambrosino observed Plaintiff walking "up" the block (from Myrtle toward the police van), and, by the time Ambrosino stopped the van, Plaintiff had walked about 20 feet toward the van. (Tr. 354, 360–61.) Ambrosino saw the butt of a gun hanging out of Plaintiff's left pocket and yelled, "gun" to alert Officer Perez. (Tr. 362, 425.) Ambrosino got out of the van, and continued to yell, "gun." (Tr. 363.) He approached Plaintiff with his gun drawn, and he and Perez formed a "tactical V" centered on Plaintiff. (Tr. 363, 425.) Ambrosino commanded Plaintiff, "Police, don't move." (Tr. 435.) Plaintiff then took the gun out of his pocket. (*Id.*) Ambrosino said, "drop the gun," and then, "drop the effing gun" three times. (Tr. 364, 425, 435.) Plaintiff did not drop the gun. (Tr. 434.) Plaintiff began to "lift up and turn[]," holding the gun at a 90-degree angle, pointing it in Ambrosino's direction (at which time Ambrosino "took cover" behind the van) and then continued to pivot, "almost like a cowboy", so that the gun was pointed at Perez. (Tr. 365–66, 406, 425.) While Plaintiff was facing Perez, Ambrosino heard two shots fired. (Tr. 372–73, 408–09.)[10] He "punch[ed] [his] gun out to shoot," and at the same time saw Plaintiff

---

[9] Plaintiffs' counsel used the reference "White Castle-side" throughout the trial to indicate the side of Linden Street that Plaintiff was on when he was shot.

[10] At other points during his testimony, Ambrosino stated that he heard gunfire while Plaintiff was pointing the gun at him. (Tr. 366, 408–09.) He explained that it was "very possible"

"drop[] right to the floor." (Tr. 425.) At the moment Plaintiff was shot, he was standing, Perez was standing, and Ambrosino was slightly crouched behind the police van. (Tr. 373.) After Perez shot Plaintiff, and Plaintiff fell, Ambrosino approached Plaintiff on the ground, told him to look away, and kicked the gun from under Plaintiff's hand. (Tr. 374, 412–13, 426.) When he kicked the gun, it hit a wall and broke into pieces. (Tr. 375, 417.) Ambrosino testified that he initially thought the gun was a .45-caliber semi-automatic handgun, but later learned that it was an air pistol that was incapable of firing ammunition. (Tr. 430–31.)

On cross-examination, Officer Ambrosino acknowledged riding to the hospital in a police van with Officers Bhagan and Perez, and another officer. (Tr. 503–04.) When they arrived at the hospital, Ambrosino, Perez, and Bhagan remained together, accompanied by representatives from their union. (Tr. 350–52, 509.) He testified that at the hospital, he did not speak to his partners about what had happened. (Tr. 351.)

Officer Ambrosino gave testimony related to his line-of-duty report. (Tr. 380.) The report had three sections: one filled out by Sergeant Sanchez[11] after he had interviewed Ambrosino; one filled out by Sergeant (George) Duffy after he had interviewed Ambrosino; and one filled out by Ambrosino himself. Sergeant Sanchez wrote, "PO Ambrosino responded to a dispute with a firearm. Upon arrival, he encountered a male with a firearm and pointed the weapon in his direction. A second officer fired his weapon, striking the male. PO Ambrosino suffered from chest pains following the incident." (Tr. 382; Pl.'s Exhibit 102.) Sergeant Duffy's section also stated that Plaintiff had pointed a firearm in Ambrosino's direction, at which time Perez had fired two

---

that it was pointed at both Perez and himself at the same time, because Plaintiff had turned with the gun. (Tr. 408.)

[11] Sergeant Sanchez was identified only by his last name at trial.

rounds, striking Plaintiff.  (Tr. 382–83; Pl.'s Exhibit 102.)  It stated that Ambrosino had had chest pains directly after the incident, and recommended line-of-duty designation.  (Pl.'s Exhibit 102.)[12] Ambrosino's section of the report stated that, when Ambrosino saw Plaintiff point the gun in his direction, Ambrosino instructed Plaintiff to "drop the gun, police don't move," and took cover, and then Perez shot Plaintiff.  (Tr. 384; Pl.'s Exhibit 102.)  Ambrosino's form in support of Perez's line-of-duty report stated essentially the same thing.  (Tr. 386.)

Plaintiffs' counsel played the On-the-Run security video footage, which showed Officers Ambrosino, Bhagan, and Perez stopping in at the mini-mart around 11:00 p.m. on February 5, 2010.  (Tr. 323–24; Plaintiffs' Exhibit 44.[13])  Ambrosino identified a man on the video as Plaintiff. (Tr. 332.)  In the video, the man whom Ambrosino identified as Plaintiff was standing next to Ambrosino at the coffee station.  (Tr. 335.)  Ambrosino also identified Perez and Bhagan in the video.  (Tr. 333–34.)  Ambrosino testified that he did not have any memory of having been in the mini-mart, but that based on his viewing of the video, he did not see a gun in the waistband of the man whom he identified as Plaintiff, and he did not see that man stagger.  (Tr. 337, 341, 346.)  He also testified that he did not remember the man slurring his speech or smelling like alcohol (because he had no memory of having been there).  (Tr. 341, 346.)

Later, during cross-examination of Ambrosino, defense counsel Lax replayed the video for Ambrosino, who then identified a different person as Plaintiff.  (Tr. 485.)  The man whom Ambrosino later identified as Plaintiff entered the mini-mart after the officers had left, and used

---

[12] This appeared to refer to line-of-duty injury designation.  (Tr. 630, 639.)

[13] Plaintiffs' Exhibit 44 and Defense Exhibit G (that Plaintiff was shown on cross-examination) were the same video.

the ATM in the store, before leaving and walking across the parking lot and "[u]p" Myrtle Avenue. (Tr. 480–97.)[14]

### 3. Defendant Officer Raul Perez

Officer Perez testified that on the night of February 5, 2010, he was the recording officer in the police van with Officers Ambrosino and Bhagan, and was sitting in the front passenger seat. (Tr. 584–85.)  Shortly after 1:00 a.m., the officers received a radio run sending them to Linden Street between Myrtle and Wyckoff Avenues.  (Tr. 585–86.)  The van stopped at the corner of Wyckoff to let Officer Bhagan out, and then turned onto Linden going against traffic.  (Tr. 586–87.)  Perez saw Bhagan walk to the sidewalk on the White Castle-side of the street.  (Tr. 587.)  The van proceeded down the block, and then Perez heard the words, "Gun, gun" and the van stopped. (*Id.*)[15]  Perez saw a man walking toward the van, on the White Castle-side of the street.  (Tr. 593.)[16] When the officers got closer, Perez got out of the van, and saw a man, Plaintiff, with a firearm in his left coat pocket.  (Tr. 594, 596.)  After he exited the van, Perez moved around to the front of the van, and when he saw the gun in Plaintiff's left-coat pocket, Perez said, "Drop the gun, drop the gun," and "Police don't move."  (Tr. 597–98.)  At some point, Perez also heard Ambrosino

---

[14] Defense counsel Lax accused Plaintiffs' counsel Fred Brewington of a "gambit" and of "a psychological game" in deceiving Ambrosino to misidentify the man in the video, although he did not specify what relief he was seeking from the Court.  (Tr. 393.)  The Court accepted Brewington's representation that it was a good-faith mistake, especially given the Court's observation of the blurriness of the security video footage. (Tr. 530–32.)  In their brief for the present motion, Defendants once again raise the issue of Plaintiff having "lie[d] to his counsel and the court."  (Dkt. 86 ("Defendants' Br.") at 19–20.)  The Court need not address this argument in light of its decision not to grant Plaintiffs' Rule 59(a) motion.

[15] Later in his testimony, Perez stated that he did not hear "Gun, gun."  (Tr. 588.)

[16] There was some dispute during Perez's testimony as to whether the man he initially saw walking on Linden was Plaintiff or someone else.  (Tr. 594–96.)

say, "Gun, gun."  (Tr. 597–98.)  Ambrosino was between the car and the sidewalk,[17] moving toward the sidewalk, and Perez was in the street.  (Tr. 599, 601.)  There was a row of cars between the sidewalk and the street, and Perez could see the top part of Plaintiff's body over the hood of a sedan.  (Tr. 655.)  Plaintiff took the gun out of his pocket with his left hand and pointed the gun "punched out" at Ambrosino; Perez feared for Ambrosino's safety and thought Plaintiff was going to kill Ambrosino.  (Tr. 601, 608, 612, 621, 650, 652–53.)  Plaintiff did not point the gun at Perez. (Tr. 601, 612.)  Plaintiff was standing on the sidewalk.  (Tr. 703.)  At the time, Perez thought that the gun was a .45-caliber handgun.  (Tr. 652.)  Perez was about eight feet away,[18] and had his gun "trained" on Plaintiff, meaning it was in a position ready to be fired.  (Tr. 601–03.)  When Plaintiff did not drop the gun, Perez shot him twice, within a few seconds.  (Tr. 607–08, 663.)  Plaintiff went down on his back, with his head pointed toward the White Castle and Myrtle Avenue, and his feet pointed toward Wyckoff.  (Tr. 613.)  Perez saw the gun fall about a foot from Plaintiff's body, on the street side (as opposed to the White Castle-side/building-side).  (Tr. 614.)  Ambrosino kicked the gun, and it hit the wall of the building.  (Tr. 615.)  Perez assisted another officer in handcuffing Plaintiff.  (Tr. 642.)

---

[17] Later in his testimony, Perez placed Ambrosino between the van and a car.  (Tr. 663.) In a NYPD "GO-15 statement" from April 2010, Perez stated that Ambrosino was on the sidewalk. (Tr. 599–600.)

[18] There was some dispute during Perez's testimony regarding the distance from Perez to Plaintiff at the time of the shooting.  Perez estimated the distance by telling Plaintiffs' counsel Brewington how far away to stand from Perez, and Brewington then measured the distance using his own steps.  Brewington paced off 12-½ steps to the witness stand, estimating that it would have been about 13 or 14 steps to the witness, and stating that he wore a size-12 shoe.  (Tr. 607–12.)

After the shooting, Officers Perez, Ambrosino, and Bhagan traveled to the hospital together.  (Tr. 621–22.)  They remained together at the hospital, but did not talk about the incident.  (Tr. 622.)[19]  Union representatives were with them in the hospital.  (Tr. 626.)

In Officer Perez's line-of-duty report, Sergeant Sanchez wrote after interviewing Perez: "PO Perez responded to a dispute and encountered a male with a firearm.  PO Perez ordered the male to drop the firearm[,] [a]t which time the male drew his firearm and pointed it at PO Perez.  PO Perez then fired two rounds striking the male."  (Tr. 633; Pl.'s Exhibit 103.)  It also stated that immediately after the shooting, Perez felt chest pains and shortness of breath.  (*Id.*)  Sergeant Duffy wrote that Perez had observed Plaintiff and attempted to stop him, at which time he observed a firearm in Plaintiff's waistband and ordered him to drop it.  (Tr. 635; Pl.'s Exhibit 103.)  Duffy's report then stated that Plaintiff drew his firearm and pointed it in Perez's direction, at which time Perez fired two rounds, striking Plaintiff.  (Tr. 635–36; Pl.'s Exhibit 103.)  Perez denied reading Sergeant Sanchez's or Duffy's sections of the report before signing his own section.  (Tr. 634, 636.)  He also denied providing Sergeant Sanchez or Duffy the information in their portions of Perez's line-of-duty report.  (Tr. 633, 636.)[20]  Sergeant Duffy's report stated that Perez immediately began having chest pains and shortness of breath, and recommended a line-of-duty designation.  (Tr. 636; Pl.'s Exhibit 103.)

The portion of the report that Officer Perez filled out stated that he had approached Plaintiff, who pointed a firearm at Perez's partner, and that Perez drew his weapon and said

---

[19]  At his deposition, Perez stated that he did not remember if the three officers had discussed the incident at the emergency room.  (Tr. 624.)

[20]  Plaintiffs' counsel elicited from Perez that, contrary to the description of the incident reported by Sergeants Sanchez and Duffy in Perez's line-of-duty report, Plaintiff did not draw a gun from his waistband and did not point it in Perez's direction (as opposed to in Ambrosino's direction).  (Tr. 635–36.)

"Police, don't move" and "Drop the gun, drop the gun;" at which point Plaintiff reached for his firearm and Perez fired two rounds, striking Plaintiff. (Tr. 637; Pl.'s Exhibit 103.) Perez also stated in the following section of the report that Plaintiff pointed his gun in Ambrosino's direction, that Perez instructed Plaintiff to drop the gun, and that Plaintiff "was shot." (Tr. 640.) Perez acknowledged during cross-examination that the report incorrectly stated that Perez drew his weapon only after Plaintiff pointed the gun at Ambrosino. (Tr. 637.) Perez also admitted to signing the line-of-duty report, but did not directly answer whether he had read it. (Tr. 638–40.)

4.     Defendant Officer Steven Bhagan's Testimony

On the night of February 5, 2010, Officer Bhagan was on duty, partnered with Officers Ambrosino and Perez in a police van. (Tr. 182–83.) Ambrosino was driving; Perez was in the passenger seat; and Bhagan was in the back of the van. (Tr. 183.) They received a radio dispatch that there was a man with a gun on Linden Street. (Tr. 187–88.) The van approached Linden Street from Wyckoff Avenue, and prior to reaching that intersection, the van stopped, and Bhagan exited so that if someone ran down the block, he could intercept that person. (Tr. 189.)[21]

Bhagan stated that when he got out of the van, he crossed the street to the White Castle side and was on the sidewalk. (Tr. 199–200.) There was a street light at Linden and Wyckoff, a "little" light on the buildings, and light coming from the White Castle. (Tr. 193, 202.) Yet, Bhagan did not see a man standing or walking with a gun. (Tr. 215, 222.)

Bhagan advanced down the sidewalk, and at some point heard, "Gun, gun." (Tr. 223.) He then saw someone kneeling on the sidewalk between the two fences. (Tr. 225.) Bhagan stated that he was weaving in-between the cars parked on the side of the street, (*i.e.*, between the sidewalk

---

[21] Looking at a photo of the scene (Plaintiff's Exhibit 30-A), Bhagan identified the place where Plaintiff lay after being shot, which was on the White Castle-side of Linden between two fences. (Tr. 197.)

and the street).  (Tr. 240.)  On cross-examination, he stated that there were cars parked all the way to Wyckoff, and that he was weaving in-between them when he heard "Gun, gun".  (Tr. 296, 298.)[22]  Bhagan never saw Plaintiff holding a gun.  (Tr. 230.)  At the time the shots were fired, he did not see either Officer Ambrosino or Officer Perez.  (Tr. 300.)  Bhagan did see Ambrosino kick the gun on the ground.  (Tr. 248.)

After the incident, Officers Bhagan, Ambrosino, and Perez went to the hospital together and spent time together in the emergency room.  (Tr. 256–57.)  Several other NYPD officers were there as well.  (*Id.*)  When asked if they spoke about the incident, Bhagan stated, "[u]m, not exactly sure what we discussed."  (Tr. 257.)

Officer Bhagan also testified about his line-of-duty injury report from the night of the incident.  (Tr. 251.)  In that report, Sergeant Sanchez wrote: "Police Officer Bhagan responded to a dispute with a firearm[.]  [D]uring the course of the incident[,] a male pointed a firearm in his direction, at which time a second officer fired his weapon striking the male.  Following the incident[,] dizz[i]ness and rapid heart beat."  (Tr. 253–54; Pl.'s Exhibit 2.)  Bhagan denied telling Sanchez that a man pointed a gun at him (Bhagan).  (Tr. 254.)  Sergeant Duffy wrote, "[Bhagan] responded to a 52 firearm.  Perp pointed firearm in his direction at which time a second officer fired two shots striking perp.  After incident [Bhagan] experienced dizz[i]ness and a rapid heartbeat."  (Tr. 259; Pl.'s Exhibit 2.)  Once again, Bhagan testified that Sergeant Duffy's section was in error regarding the man pointing a gun at Bhagan.  (Tr. 259; 304–05.)  Finally, Part C, which had Bhagan's signature on it, stated that while responding to a 10-10 male with a firearm,

---

[22]  Bhagan acknowledged that, in the diagram of the scene that he drew for the NYPD's post-incident investigation, he did not indicate that there were any cars parked on the street between where he was dropped off, at the corner of Linden Street and Wyckoff Avenue, and where he was when he heard a gunshot.  (Tr. 240–41.)

Bhagan "approach[ed] perp who pointed [a] firearm in the direction of [his] partner." (Tr. 262; Pl.'s Exhibit 2.) He admitted that he had not seen anyone point a gun at Ambrosino. (Tr. 262.) Bhagan stated that he was not sure if he had read Parts A or B, but that he had read and signed Part C.[23] (Tr. 281.)

Plaintiffs' counsel also showed Bhagan Plaintiff's Exhibit 75, which Bhagan had written in support of Ambrosino's field of duty report, in which Bhagan wrote "Upon arriving at the scene perp did point firearm towards P.O. Ambrosino" and "Perp was shot by Police Officer Perez." (Tr. 269–70.) Bhagan again admitted that he had not seen anyone point a firearm at Ambrosino. (Tr. 270–71.) ("Q: 'You swore that there was a gun pointed at this man and you never saw it, right?' A: 'That is correct.'").

### 5.    Defendant Lieutenant Greacia Herdsman's Testimony

Lieutenant Herdsman was Defendants' platoon commander on the night of February 5 into the early morning hours of February 6, 2010. (Tr. 522.) Sometime after 1:00 a.m., she received a radio run summoning her to Linden Street between Wyckoff and Myrtle Avenues. (Tr. 523.) She turned onto Linden from Myrtle. (*Id.*) When Herdsman arrived at the scene, she saw Perez in the street, walking toward Myrtle. (Tr. 536.) She heard an undiscernable first shot,[24] and then as she was getting out of the car, she heard a second shot. (Tr. 540.) When she got out of the car, she was between seven and ten feet away from Perez. (Tr. 537.) Plaintiff was on the ground in the fenced area of the sidewalk that was indented toward the apartment. (Tr. 540–41.) Herdsman

---

[23] Although Bhagan admitted that he had not seen Plaintiff point a gun at Ambrosino, he denied that Part C was incorrect. (Tr. 262) ("Q: . . .You never approached a perp who pointed a firearm at your partner, did you? A: Yes. Q: You did? A: Yes. Q: You never saw someone point a firearm at your partner, did you? A: That is correct. But I did approach him.")

[24] In a previous interview, Herdsman stated that she did not hear the first shot. (Tr. 545.)

approached the gun, which was on the ground in two pieces.  (Tr. 547–48.)  She did not remember seeing anyone else approach the weapon.  (Tr. 549.)  When she first saw Plaintiff, he was lying on the ground, with his head facing toward the White Castle, *i.e.*, toward Myrtle Avenue.  (Tr. 550, 558.)  The gun was six feet from his body.  (Tr. 550–53.)[25]  Soon thereafter, Plaintiff was handcuffed, arrested, and charged.  (Tr. 568–69.)

At the scene, Lieutenant Herdsman instructed Sergeant Duffy to send Officers Ambrosino, Perez, and Bhagan to the hospital.  (Tr. 528.)  The officers went together in the police van that Ambrosino, Perez, and Bhagan had initially driven to the scene.  (*Id.*)

In her memo book entry for that night, Lieutenant Herdsman wrote that Plaintiff had been shot two times in the left hip and left chest, and "was carrying [an] air pistol," although she acknowledged on the stand not having seen Plaintiff carrying a pistol.  (Tr. 566.)

6.    Sergeant George Duffy's Testimony

Sergeant George Duffy was Officers Ambrosino, Perez, and Bhagan's supervisor on the night of the incident.  (Tr. 737.)  After receiving a radio call in which Perez stated that shots had been fired, Duffy went to Linden Street between Myrtle and Wyckoff Avenues.  (Tr. 737–38, 754.)  Duffy testified that, at the scene, he spoke separately to Officers Perez, Ambrosino, and Bhagan, each for less than a minute.  (Tr. 755–56.)  Plaintiffs' counsel asked Duffy to listen to an audio recording of his "GO-15" interview, during which Duffy was asked about his conversations with the three officers at the scene.  (Tr. 740–44.)  While Duffy did not recall his initial conversation with Perez, he confirmed that, on the recording, he stated that Perez had seen a man with a gun in his waistband.  (Tr. 744.)  Duffy also testified that according to the recording, he spoke briefly

---

[25] There was some dispute about whether Herdsman meant that the gun was six feet from Plaintiff's feet—the closest part of his body to the weapon, or six feet from other parts of his body and thus less than six feet from his feet.  (Tr. 550–53.)

with each of the three officers prior to drafting his (Duffy's) portion of the officers' line-of-duty reports.  (Tr. 747.)

7.    Petra Luna's Testimony

Non-party eyewitness Petra Luna testified in Spanish through a certified Spanish translator. (Tr. 765.)  Luna testified that at around 1:00 a.m. on February 6, 2010, she was dropping off her friend, Ruth Albinia,[26] who lived on Linden Street, between Wyckoff and Myrtle Avenues.  (Tr. 767.)  After Luna and Albina arrived on Linden, they were talking in the car, when suddenly, "in the darkness, [they] saw two people coming, struggling," moving from Wyckoff Avenue toward Myrtle Avenue.  (Tr. 768, 803.)  Luna was parked about 15 car-lengths from where the struggle was happening, and moved her car forward to get a better view.  (Tr. 768–69.)  She observed, from the opposite side of the street, a man who "looked Mexican" striking a man who "looked Argentinian" "strongly" on the upper back.  (Tr. 769–70.)[27]

Luna honked her horn ten or fifteen times so that the assailant would stop striking Plaintiff. (Tr. 770.)  As she was honking, she clearly saw a "pistol f[a]ll in between the two people" and land on the corner.  (Tr. 770–71.)[28]  She then saw Plaintiff fall to the ground and throw his hands back.  (Tr. 774, 776.)  He tried to get up, at which point the attacker, who had left, came back. (*Id.*)  Luna thought that the attacker was coming back to hit Plaintiff, but when Plaintiff tried to

---

[26] Luna's friend's name is later misspelled as "Albania" in the transcript.  (Tr. 799.)

[27] Based on the other evidence introduced at trial, in particular, Plaintiff's testimony about being attacked by a man with a Hispanic accent, and for ease of reference, the Court will hereafter refer to the "Mexican"-looking man as the "attacker" or "assailant" and the "Argentinian"-looking man as Plaintiff.

[28] On cross-examination, Luna stated the chronology slightly differently.  She testified that the two men were struggling, then the gun fell to the ground, and then the assailant started striking Plaintiff.  (Tr. 809.)

get up, he fell back to the ground, and the assailant picked up his hat and walked off toward Wyckoff Avenue.  (Tr. 776–77.)  After Plaintiff fell, he "stayed immobile" and "did not move any more, like unconscious."  (Tr. 776.)  At that point, the left side of his body was facing the front of the building (*i.e.*, away from the street), his feet were facing toward Myrtle Avenue, and his head was facing Wyckoff Avenue.  (Tr. 806.)  Luna testified that the gun was on the ground four or five feet from Plaintiff when she last saw him.  (Tr. 850.)

After the assailant left the second time, Albinia called the police.  (Tr. 777.)  Luna put her car in reverse and moved back to a space near the curb next to a fire hydrant on the opposite side of the street from where Plaintiff lay.  (Tr. 777, 783, 785.)  Right after parking her car, Luna observed a couple walking from Myrtle Avenue toward Wyckoff Avenue with a little girl on the side of the street where Plaintiff had fallen.  (Tr. 783–84.)  The family walked past Plaintiff lying on the ground and continued toward Wyckoff.  (Tr. 787.)

Just before the family reached Wyckoff, Luna saw the police arriving, approaching from Myrtle and driving toward Wyckoff on Linden.  (Tr. 780, 787, 795.)  She testified that the police "went by [her] violently and stopped in a very violent manner, very quickly."  (Tr. 787.)  "Immediately the two doors of the [police] car opened and . . .the [driver] exit[ed] [and] . . . fired twice" while shouting something that she could not hear.  (*Id.*)  As soon as the driver finished firing the second shot, the other officer, who had walked behind the car and was by then at the driver's side, immediately fired twice as well.  (*Id.*)

At the time the shots were fired, Luna could not see who or what the police were firing at.  (Tr. 787–88.)  She could not see the man on the ground because the police car was obstructing her view; however, she could see where the shots were aimed.  (Tr. 788, 840.)  Luna testified that had

Plaintiff stood up, she would have seen him. (Tr. 840–41.)[29] After the officers fired the four shots, Luna turned her attention to her friend Albinia, who was having a "nervous breakdown." (Tr. 788.) A policewoman then arrived and told Luna to leave because the street was going to be surrounded and she would not be able to leave once that happened. (*Id.*) The police officers then helped Luna exit through the White Castle parking lot. (*Id.*)

After Luna got home, she received a call from Albinia, who was with the police. (Tr. 790.) A police officer told Luna over the phone that they wanted her to go to the precinct so that they could interview her. (*Id.*) Twenty minutes later, the police arrived and picked Luna up from her home, and brought her to the precinct. (Tr. 790–91.) That morning, she was interviewed by the police three times. (Tr. 794, 797.) Around two years later, she gave a deposition. (Tr. 797–98.)

During cross-examination, defense counsel Lax played a recording of Luna's interview by the police on the morning of the incident, which was conducted in Spanish by a Spanish-speaking detective, without the assistance of a professional or certified translator. (Tr. 850–56, 1228.) At one point, Lax paused the recording and the following colloquy ensued:

Lax: Okay, we stopped at 06 minutes and 36 seconds.

The Court: Excuse me, was there an answer in English?

Lax: Yes, I heard it.

The Court: I did not hear it. Would you mind playing it again? Did you hear it Mr. Brewington?

Brewington: I didn't hear it in English, and I also don't know what the subject was of the question.

The Court: Can you start it a little bit earlier?

---

[29] Defendants attempted to impeach her testimony by reading a portion of her deposition in which she stated that she would not have seen the man if he had stood up, but it was not entirely clear whether Luna's deposition testimony was referring to the same timeframe. (Tr. 841–43.)

. . .

The Court: I did not hear any English.

Lax: She says *si*, and he says less than five inches.

The Court: Hang on a second, that is you testifying now.

Lax: I'm sorry.

The Court: My concern is I do not know about anybody else, but I did not hear what you just said. Of course, it is the jury's hearing that matters. You may need to play it one more time. I am a little concerned about this.
. . .

[Recording is replayed.]

. . .

Lax: Ms. Luna, you heard a man on the recording ask you the distance from the man to the gun, correct?

Luna: The question was confusing.

Lax: So the question what was the distance from the man to the gun was confusing to you?

Luna: Yes. He wasn't speaking clearly.

Lax: So in that recording it's your testimony that that question wasn't clear?

Luna: Perhaps.

Lax: Perhaps, okay.

Luna: I am sure that it was five feet, not five inches.

Lax: You heard the voice of the man just now use the word *Pulgadas*, P-U-L-G-A-D-A-S, correct?

Luna: Yes.

Lax: And then you heard your voice say *si*, which means yes in Spanish, correct?

. . .

Lax: And *pulgadas* is the word in Spanish for inches, correct?

Luna: Yes.

(Tr. 853–55.)

On re-direct examination, Luna reaffirmed her belief that the distance of the gun from the man on the ground was four or five feet. (Tr. 857.) Plaintiffs' counsel Brewington also asked Luna about her confusion during the interview with the detective. (Tr. 857.) Brewington asked what she meant when she said it was confusing, and she replied, "The man that translated into Spanish said something strange. Perhaps, at that time I didn't hear that because the gun could not have been so close since it fell, slipped[,] and moved." (Tr. 857.) When Brewington asked whether she had any difficulty understanding what was being asked of her in Spanish at the interview, Luna replied, "Yes, lots." (Tr. 859.) She thereafter stated to the Court that the Detective's question "wasn't good Spanish." (Tr. 860.)

### 8. Dr. Alan Miller's Testimony

Dr. Alan Miller testified as an expert in emergency medicine and the treatment of physical trauma. (Tr. 1002–03.) He stated that he had expertise in the treatment and assessment of gunshot wounds. (*Id*.) Dr. Miller did not treat Plaintiff, but prior to trial, he reviewed Plaintiff's medical records and police reports from the incident. (Tr. 1011.) Dr. Miller opined on the trajectory of Plaintiff's bullet wounds. (Tr. 1020.) He stated his opinion that the "first bullet"[30] that entered Plaintiff's left axilla, under his armpit, "traveled inferiorly downward causing him to have a collapsed left lung[,] . . . [and] also penetrated his diaphragm into his abdominal cavity, causing free air, bleeding, subsequently striking his eighth rib." (*Id.*) He stated that "[t]he bullet pulverized that rib" causing it to fragment, and causing damage. (*Id.*) The bullet then "[f]racture[d] . . . his

---

[30] While Dr. Miller identified the two bullets as the "first" and "second" bullet, he did not testify as to the order in which they were fired. (Tr. 1037.)

tenth thoracic vertebrae causing those bone fracture fragments to push against his spinal cord, causing paralysis." (*Id.*)

Dr. Miller based his conclusion regarding the first bullet's trajectory on the fact that the "second bullet", which had shattered Plaintiff's hip, did not appear to cause the injury to Plaintiff's spine. (Tr. 1023, 1042, 1081–82.) Dr. Miller's report stated that there were bullet fragments from this second bullet, and that one was on the right side of the back of the pelvis. (Tr. 1086–88.) He stated that there were bullet fragments along the pelvic wall bone. (Tr. 1091.) Dr. Miller opined that the bullet that entered at Plaintiff's hip could have traveled straight across his body or could have gone "a little down." (Tr. 1092.) He stated that this bullet had hit a bone after entering Plaintiff's pelvis and shattered, with fragments going in different directions. (Tr. 1095.)

Dr. Miller opined that the injury caused by the first bullet would not be consistent with a bullet fired toward a person who was standing squarely facing the shooter. (Tr. 1023–24.) Plaintiffs' counsel then posed another hypothetical to Dr. Miller, asking him to assume that a person lying on the ground had his left side angled toward the shooter standing up seven or eight feet away. (Tr. 1024–25.) Dr. Miller opined that the injury would be consistent with those facts. (Tr. 1025.)

On cross-examination of Dr. Miller, there was some dispute as to what the photos and diagrams from Plaintiff's medical records depicted. Looking at one photo, Dr. Miller stated that a mark on the right side of Plaintiff's chest appeared to be from the insertion of a chest tube. (Tr. 1048.) From looking at a diagram in Plaintiff's records, Dr. Miller opined that there appeared to be a chest tube inserted at the site of one of the gunshot wounds in Plaintiff's left axilla. (Tr. 1052–

53.) [31]   Looking at a different photograph, it was not clear whether the wound shown was Plaintiff's chest wound or hip wound.  (Tr. 1099.)

Dr. Miller also acknowledged that there was a bullet fragment near the right lung.  (Tr. 1107.)  A shard of bullet that had traversed the body from the left to the right side had caused a small lung collapse on the right side.  (Tr. 1108–09.)  He testified that there was a fracture with bullet fragments on the left side at the eighth rib, and a fracture on the right side with bullet fragments at the ninth rib.  (Tr. 1121.)  Dr. Miller stated that he could not say with certainty which bullet caused the injuries on the right side of the body.  (Tr. 1120.)  He stated that it was "plausible" that the bullet that entered at Plaintiff's left axilla hit the left rib and then traveled across the body and fractured the ninth rib on the right side, but that it was also "plausible" that the bullet that entered Plaintiff's hip caused the injury to that rib.  (Tr. 1121–22.)

9.    Chief Timothy Longo's Testimony

Timothy Longo, a retired police chief and police department consultant in Washington, D.C., testified as an expert in the area of police science, police procedures, use of force, and police practices.  (Tr. 1143–45 (Longo's experience included providing training to police departments on, *inter alia*, proper use of force).)  Longo opined on the various standards that are supposed to guide officers in determining whether to use force.  (Tr. 1156.)  Longo testified, *inter alia*, that after officers are involved in a police shooting, it is important that they be kept separate to avoid the perception of collusion or tainting their memories.  (Tr. 1169–71.)

---

[31] During summation, defense counsel sought to discredit Dr. Miller on the basis that it would be "crazy" to insert a chest tube at the site of a bullet wound, and argued that the bullet wound may have been in a different location than where Dr. Miller had indicated.  (Tr. 1300–03.)

## C. Defendants' Evidence

During Defendants' case, they played the 911 call from the incident, accompanied by a certified Spanish-to-English translation, because the call was in Spanish. (Tr. 1253–54.) They also adopted the testimony of the Defendants and Sergeant Duffy. (Tr. 1254.)

## D. Defense Counsel Lax's Closing Argument[32]

In his closing argument, defense counsel Lax, in discussing Petra Luna's testimony, made the following statements:

> Lax: She comes here, and she says, oh, yeah, no, I definitely would have seen him if he stood up. And you may be asking yourselves how did this happen? How did Luna go from one bad fact for plaintiff, two bad facts for plaintiff, three bad facts for plaintiffs, to everything plaintiff says is true; I'm going to corroborate it all?
>
> Well, to answer that question, let me ask you this: Did you pay attention to where Plaintiffs' other attorney was while Mr. Brewington was asking questions the other morning?
>
> Did you notice Ms. Harris-Marchesi[33] disappear while the witness, I believe, Sergeant Duffy, was testifying on Thursday morning right before Luna took the stand? And did you notice how Mr. Brewington greeted the translator? If you consider all those things, you'll have your answer.
>
> Brewington: Objection.
>
> The Court: Sustained.

(Tr. 1294.)[34]

---

[32] The Court only provides the portion of closing arguments relevant to the instant motion.

[33] Plaintiffs' counsel Brewington was assisted at trial by attorney Cathryn Harris-Marchesi.

[34] Defense counsel never asked Luna during cross-examination whether she had even met with Plaintiffs' counsel prior to testifying at the trial or about any purported hallway meeting between Luna and Harris-Marchesi. There was also no evidence in the record about Brewington's relationship or prior work with the Spanish language interpreter whom Lax suggested Brewington greeted warmly.

At the sidebar that followed, the Court warned defense counsel Lax to "be very careful suggesting these lawyers did anything improper." (Tr. 1295.) The Court said, "I expect you to get back to the much more benign point that sometimes witnesses might be persuaded to say things differently. But let me say this, you're straddling that line by suggesting Mr. Brewington and Ms. Harris-Marchesi wanted the witness to say something that they believed was untrue or in some way was subverting a process." (Tr. 1296.)

The following exchange also ensued:

LAX: No, my point is that they prepared her in the hallway, and they had a good relationship with her, and that we saw them. The way it unfolded is just what I explained.

HARRIS-MARCHESI: That's absolutely untrue.

THE COURT: You are speculating about what they might have said; that they prepare their witnesses is fine. Why don't you just state the facts, and let these jurors know they called her. She was their witness, and that's it. But the speculation about what they did in the hallway is off limits.

KURUVILLA: I don't believe Mr. Lax has gotten to a point where a curative --

THE COURT: He's past that point because he said they were in the hallway together. I don't like what you're trying to imply. I'm going to strike the last part of [Lax's] argument, and just remind everybody that it's argument, and they shouldn't speculate about any contact lawyers have had with witnesses. . . .

(Tr. 1296–97.)

The Court then gave the jury the following curative instruction:

Ladies and gentlemen, I'm going to strike the last part of the argument by Mr. Lax about the lawyers for the plaintiff going in the hallway, [] which you should not consider in any way. What the lawyers did with respect to preparing for their cases is of no concern to you. So just disregard that part of the argument, and, again, this is merely argument. So I want you to focus on the facts and the argument that Mr. Lax makes based on how you should interpret the facts that you saw and heard in this courtroom.

(Tr. 1298.)

### E. The Jury's Verdict

The jury returned a verdict in favor of Defendants on all counts on October 31, 2016.  (Tr. 1374–75.)

## II. PROCEDURAL HISTORY

Plaintiffs moved for a new trial on December 9, 2016, (Dkt. 84,) and the motion was fully briefed on February 6, 2017.  (Dkt. 87.)

## DISCUSSION

## I. LEGAL STANDARDS

Under Rule 59(a)(1) of the FRCP, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:  (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  In contrast to the standards governing a Rule 50 motion, a court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner" when considering a Rule 59 motion.  *Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 418 (2d Cir. 2012).  The court must, however, "exercise [its] ability to weigh credibility with caution and great restraint," and "'[w]here the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'"  *Id.* (quoting *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir. 1992)); *see also Graham v. City of New York*, 128 F. Supp. 3d 681, 693 (E.D.N.Y. 2015) ("Such evaluations should be made with a 'high degree of deference . . . to the jury's evaluation of witness credibility.'" (quoting *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97–98 (2d Cir. 2014))).  A motion for a new trial should ordinarily be denied, "'unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"

*Atkins v. New York City,* 143 F.3d 100, 102 (2d Cir. 1998) (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 911 (2d Cir.1997)); *accord Tesser v. Bd. of Educ.*, 370 F.3d 314, 320 (2d Cir. 2004); *Farrior v. Waterford Bd. of Educ.*, 277 F. 3d 633, 634 (2d Cir. 2002) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998)). The "mere fact" that the trial judge disagrees with the verdict is "not a sufficient basis to grant a new trial." *Finn-Verburg v. New York State Dep't of Labor*, 165 F. Supp. 2d 223, 228 (N.D.N.Y. 2001) (citing *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983)).

Moreover, "a party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as '[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.'" *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (quoting *Reilly v. Natwest Mkts. Grp., Inc.*, 181 F.3d 253, 271 (2d Cir. 1999)). In evaluating a Rule 59(a) motion based on opposing counsel's alleged improper statements to, or in the presence of, the jury, the court "must consider such a claim in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Graham*, 128 F. Supp. 3d at 698 (internal quotations omitted).

## II.     THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE

Plaintiffs argue that the jury's verdict was against the weight of the evidence. Specifically, he argues that Petra Luna's and Dr. Alan Miller's testimony "unequivocally" established that Plaintiff was lying down when Officer Perez shot him. (Dkt. 84-1 ("Plaintiff's Br.") at 3.) They further argue that Lieutenant Herdsman's and Luna's testimony supported the conclusions that Plaintiff was on the ground when he was shot, that the weapon was not within his reach, and that Ambrosino did not kick or touch the gun. (*Id.*) According to Plaintiffs, it is clear from the evidence

that Officers Ambrosino, Perez, and Bhagan concocted a story to justify the shooting when they traveled in the police van together to the hospital. (*Id.*)

The Court does not find that the jury "reached a seriously erroneous result" or that the verdict constituted a "miscarriage of justice." *Farrior*, 277 F. 3d at 634. The evidence presented at trial told two very different stories, and it was the role of the jury to determine which, if either, story to believe, based on its assessment of the witnesses' credibility and the other evidence. *See Raedle*, 670 F.3d at 418 (explaining that when "the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial"). Clearly, if the jury found Officers Ambrosino and Perez to be credible, it could have concluded that Plaintiff pointed a gun at one or both of them, justifying the shooting as a reasonable use of force and justifying Plaintiff's subsequent arrest and criminal process.

Plaintiffs overstate the contradictory evidence as "unequivocally" or "irrefutably" establishing that Plaintiff was lying on the ground and not holding or pointing a gun. (Plaintiff's Br. at 3.) Only Officers Ambrosino and Perez testified to seeing Plaintiff at the moment he was shot and they both testified that Plaintiff was standing and pointing a gun at that time. No witnesses testified, or were in a position to testify, that Plaintiff was lying on the ground and not holding or pointing the gun at the time Perez shot him.[35]

---

[35] Furthermore, as discussed in Part III(C), *infra*, the jurors' choices were not simply binary; they could have believed an altogether different version of events that no witness specifically testified to, *e.g.*, that Plaintiff was lying on the ground, yet still pointing the gun at the officers. They also could have believed that Plaintiff was kneeling on the ground, based on Bhagan's testimony that he saw someone kneeling on the sidewalk, between the two fences. (Tr. 225–26.)

Plaintiff himself testified that he passed out after he was attacked, and did not remember anything that transpired until he was being handcuffed by the police and could not get up. The jury could have inferred that Plaintiff pointed a gun at Defendants and was too drunk to remember doing so, or alternatively, could have decided that he was lying. Furthermore, on the stand, Plaintiff explained that he had given different testimony during his deposition about being tied up with electrical tape at the scene and thrown into a dirty van because his "mind ha[d] played tricks on [him]" and was "running amuck based on what had happened." (Tr. 954–55.) Based on these statements, the jury could have decided not to credit some or all of his trial testimony.

Luna testified that she could not see Plaintiff when he was shot by the officers. The jury could have placed little weight in her statement that she "would have" seen him had he stood up, in light of the hypothetical nature of the statement, and the fact that she moved her car some distance from the location of the shooting.[36] Or, the jury could have found Luna not credible in light of the suggestion that her testimony about how far the gun was from Plaintiff moments before the shooting seemed to change from her police interview to her trial testimony—from five inches to five feet—and the fact that certain aspects of her testimony were contradicted by other evidence, such as her testimony that Plaintiff fell with the left side of his body facing the building, which would have made it impossible for the police to have shot him on his left side, as the medical evidence clearly demonstrated and Plaintiff's own expert testified.

As to Officer Bhagan, while his testimony suggested that he should have seen Plaintiff before the shooting, if, as Officers Ambrosino and Perez testified, Plaintiff was walking up Linden

---

[36] The Court does not find that Luna's trial testimony contradicted her deposition testimony stating that she would not have seen Plaintiff had he been standing, in light of confusion as to the chronology of events, and Defendants' choice not to ask further clarifying questions about her prior statement on cross-examination. (Tr. 841–43.)

Street and then stood and pointed a gun at them, Bhagan also testified that he was weaving between the cars, such that the jury could have concluded that he missed some of the events while doing so. Furthermore, the jury also could have concluded that had Bhagan concocted a false story with Ambrosino and Perez while riding in the van to the hospital, as Plaintiff argued, Bhagan would have told the same lie that Ambrosino and Perez told, rather than, as Bhagan did, testify in a way that undermined the other officers' account.

Regarding Lieutenant Herdsman, although her testimony was inconsistent in certain respects with the accounts of the other three Defendants, it was not irreconcilable with their testimony. Herdsman testified that she did not see any civilians standing on the sidewalk when she arrived, that she was exiting the vehicle when Perez fired the second shot, that she did not see anyone kick the gun, that she did not see anyone else approach the gun besides her, and that the gun was six feet from Plaintiff when she approached it. In light of Herdsman's testimony that the second shot was fired as she was exiting the car, the jury could have found that she simply missed seeing Plaintiff walk, stand, and hold or point a gun at the officers, and also missed seeing Ambrosino kick the gun, all because she was getting out of her car.

Plaintiffs place substantial weight on the opportunity Defendants had to concoct a story while they rode together to the hospital and the time they spent together in the emergency room. However, while the jurors certainly could have concluded that Defendants coordinated a lie, they were also justified in choosing to reject that conclusion, based on their assessment of Defendants' credibility. Furthermore, as noted, Bhagan's testimony that he did not see Plaintiff walking, standing up, or pointing a gun undermines Plaintiffs' argument about collusion between the three officers.

Finally, Dr. Miller's testimony was far from "unequivocal[]", and it did not "irrefutably" establish that Plaintiff was lying on the ground when he was shot. Dr. Miller's explanation for why the first bullet traveled downward and why the second bullet did not cause Plaintiff's spinal injury was convoluted and difficult to follow. Other parts of his testimony appeared to indicate that the bullets could have traveled horizontally through Plaintiff's body, such as his testimony about the left eighth rib and right ninth rib being fractured and his testimony that the second bullet could have traveled straight across Plaintiffs' body or could have gone "a little down." The jury could have concluded based on this testimony that Plaintiff was, in fact, standing when he was shot. Alternatively, the jury could have credited Dr. Miller's testimony about the first bullet traveling downward to some extent, but nevertheless concluded this fact does not prove that Plaintiff was lying on the ground when he was shot. As noted, the jury was not limited to the binary options of lying down or fully standing up, despite the witnesses' testimony as to these two alternatives; indeed, the jury could have concluded that Plaintiff was lying on the ground or kneeling with the gun in his hand or pointed at the officers when Perez shot him—which would still be consistent with Dr. Miller's testimony about the downward trajectory of the first bullet.

In sum, none of the evidence at trial provided a direct contradiction regarding the central issue—whether Plaintiff was pointing a gun at the officers when Perez shot him. Given the conflicting and inconclusive testimony and evidence on this issue, the jury could have believed Plaintiff's theory of what happened, Defendants' version of events, or neither. In the absence of a single witness who could testify to seeing Plaintiff lying on the ground posing no threat at the moment he was shot, the jury was justified in finding that Plaintiff had not proven by a preponderance of the evidence that he was subjected to excessive force, falsely arrested, or subjected to malicious abuse of process.

The cases cited by Plaintiffs are distinguishable. One of these cases, *Busch v. City of New York*, 224 F.R.D. 81 (E.D.N.Y. 2004), was an excessive force case brought by the estate of a man, Gary Busch, who was shot and killed after police officers responded to reports of an emotionally disturbed man with a hammer. After the jury returned a verdict in the defendant-officers' favor, Plaintiff moved for a new trial, arguing, *inter alia*, that the verdict was against the weight of the evidence. The district court judge granted the motion, finding that permitting the verdict to stand "would result in a miscarriage of justice." *Busch*, 24 F.R.D. at 95. At trial, the central factual dispute was whether Busch was lunging at the defendant-officers with the hammer at the time they shot him or whether he was standing still or swaying slightly with the hammer raised above his head while the officers were several feet away.

A critical distinction between *Busch* and this case, however, is that in Busch, there were *eight* civilian witnesses who testified to observing the interaction between the plaintiff and the police, most with direct views of the plaintiff, and the testimony of *seven* of them supported a finding that the plaintiff did not pose an immediate threat to the officers. *Busch*, 224 F.R.D. at 87–89. Furthermore, the testimony of the defendant-officers contradicted their own ballistics expert, and their credibility was further undermined by other evidence, such as a photo showing that the officer who said Plaintiff struck him with the hammer only had a slight abrasion on his wrist. *Id.* at 95. Finally, the defendants produced only one civilian eyewitness who corroborated the officers' claim that Busch was lunging at them, and that witness's account was contradicted by the testimony of all of the other civilian witnesses. *Id.* at 96. Here, the only witnesses who testified about what happened at the moment Plaintiff was shot were Officers Ambrosino and Perez, and no other witnesses or evidence directly or "unequivocally" contradict their accounts.

In *Song v. Ives Labs., Inc.*, 957 F.2d 1041 (2d Cir. 1992), the Second Circuit affirmed the district court's grant of a new trial as not being an abuse of discretion, based in large part on the court's "unique position to assess the credibility of the witnesses and to determine the weight which should be accorded their testimony." *Song*, 957 F.2d at 1047. However, the Second Circuit's reasoning in *Song*, in the context of deciding the degree of deference owed to a district court that has granted a new trial, does not apply to this Court's determination of the Rule 59(a) motion in the first instance. *Song*'s observation about the district court's "unique position to assess the credibility of witnesses" does not subvert the more fundamental principle that, in deciding a Rule 59 motion, a district court must "exercise [its] ability to weigh credibility with caution and great restraint," and "'[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" *Raedle,* 670 F.3d at 418 (quoting *Metromedia Co.,* 983 F.2d at 363). Indeed, notwithstanding *Song*, the Court is bound by the principle that a trial judge's disagreement with the verdict is "not a sufficient basis to grant a new trial." *Finn-Verburg*, 165 F. Supp. 2d at 228 (citing *Malliss Trust Co.*, 717 F.2d at 691).

Finally, in *Ruffin v. Fuller*, 125 F. Supp. 2d 105 (S.D.N.Y. 2000), the district court granted the plaintiff's request for a new trial in a police misconduct case. However, there, the court had before it a surveillance videotape that directly contradicted the testimony of many of the defendant-officers. For example, the videotape showed that an officer who testified that he did not use a night stick to subdue the plaintiff, in fact, swung a baton at the plaintiff. *Ruffin*, 125 F. Supp. 2d at 109–10. Furthermore, a critical part of the surveillance videotape had been destroyed, thus providing a basis for a negative inference against the defendant-officers. *Id.* at 110. While the *Ruffin* court properly found that inconsistencies in the defendant-officers' testimony regarding the

disputed incident went "directly to the heart of their credibility about what took place during the altercation," here, the Court does not find that the inconsistencies in Defendants' testimony about the relevant events in *this* case so undermined their credibility that allowing the verdict to stand would result in a miscarriage of justice. The most material "inconsistency" between the four Defendant-Officers' testimony relates to what Plaintiff was doing shortly before and at the time he was shot by Perez, *i.e.*, whether Plaintiff was walking on Linden Street with a gun in his pocket, and then standing and pointing the gun in the direction of Ambrosino and/or Perez, as was testified to by Ambrosino and Perez.[37] However, the testimony of the other two Defendant-Officers, Bhagan and Herdsman, who were not at the center of the scene at the critical time, was only inconsistent to the extent that these officers testified to *not* seeing what Perez and Ambrosino saw or what they claimed happened.[38] These inconsistencies are plausibly explained by the four officers' different vantage points and the timing of their arrivals at both the scene and the precise location of the shooting, and do not indisputably undermine Perez's or Ambrosino's credibility, nor prove that the critical events occurred as testified to by Plaintiff or Luna.

In sum, at trial, the jury was presented with the two distinct versions of the events surrounding the shooting and arrest of Plaintiff on February 6, 2010, and with evidence in support

---

[37] The Court notes that although Ambrosino's and Perez's accounts of the shooting differed with respect to which officer Plaintiff was pointing the gun at when he was shot—*i.e.*, Ambrosino testified that Plaintiff swung around with the gun in his hand, "almost like a cowboy", starting in Ambrosino's direction and then pointing it at Perez, and Perez testified that the gun was pointed at Ambrosino—these accounts are not irreconcilable or directly contradictory. A jury reasonably could have found the discrepancy to be a minor one, resulting from the fast-moving nature of the event and Plaintiff's motion, and the excitement of the moment.

[38] Lieutenant Herdsman's testimony about not seeing Officer Ambrosino kick the gun out from under Plaintiff's hand was inconsistent with Ambrosino's testimony in the same way. But, as discussed below, the two officers' testimony is not irreconcilable given Herdsman's different vantage point and late arrival on the scene.

of these two theories. Because the evidence consisted primarily of witness testimony, the jury's verdict was necessarily based on their assessments of the witnesses' credibility. The court finds that the evidence was sufficient for the jury to decide to choose one side's version of events over the other, or reject both versions and decide that the evidence showed a different version of events or was insufficient to show what actually occurred that night. For these reasons, the Court finds that the jury's verdict was not against the weight of the evidence.

## III. DEFENSE COUNSEL LAX'S MISCONDUCT DID NOT SO INFECT THE TRIAL WITH UNDUE PREJUDICE OR PASSION AS TO REQUIRE A NEW TRIAL

While the Court finds that defense counsel Lax's statements at certain points during the trial did amount to misconduct, it cannot find that his misconduct created a sufficient risk of having prejudiced the jury to warrant a new trial.

### A. Defense Counsel Lax's Misconduct During the Playing of Luna Interview

First, Plaintiffs argue that defense counsel Lax misrepresented Petra Luna's statement during her interview by the NYPD, and then made himself an unsworn witness when he offered an erroneous translation of a portion of the interview to impeach Luna's credibility. Specifically, Plaintiffs refer to the portion of the interview where the NYPD detective had asked Luna how far the gun was from Plaintiff's body, and, when the recording was difficult to understand, Lax said, "She says *si*, and he says less than five inches." (Tr. 853.)

While Lax certainly erred in offering his own understanding and interpretation of what was recorded on the audiotape, the Court finds that any resulting prejudice was, at most, minimal. First, the Court immediately stopped Lax and stated, "that is you testifying now," and "it is the jury's hearing that matters," telling him to play the recording again. (Tr. 853–54.) Secondly, when Lax thereafter asked Luna what she heard on the recording, she acknowledged that the detective asked

34

her about the distance of the gun in inches, and that she said yes. (Tr. 855.) Finally, Luna was able to reiterate during cross and re-direct examination that she was "sure that it was five feet, not five inches" and that the detective had confused her with his poor Spanish. (Tr. 855–57.) Therefore, the Court does not find that Lax's improper testifying caused any substantial prejudice, let alone such undue prejudice or passion that it infected the trial and requires a re-trial.

## B. Defense Counsel Lax's Improper Statements During Summation

Far more troubling to the Court are the statements that defense counsel Lax made during his closing argument, when in an effort to discredit Luna, the sole non-party fact witness, Lax invited the jury to infer that both of Plaintiffs' attorneys had committed misconduct, based, not on *any* evidence in the record, but purely on speculation and innuendo.

First, Lax sought to imply that Plaintiffs' counsel Brewington and Harris-Marchesi coached or convinced Luna to change her testimony to help Plaintiff. Lax's statements were particularly out of line because Defendants had not even asked Luna on the stand whether she had ever met with Plaintiffs' counsel to prepare for her testimony, or whether she had met with anyone from Plaintiffs' trial team in the hallway or elsewhere in the courthouse shortly before testifying. Instead, Lax invited the jurors to draw a completely baseless and inappropriate conclusion premised on whom they might or might not have observed being present in the courtroom prior to Luna's testimony, or worse, based on Lax telling the jurors whom *he* observed as not being present.

The Court is further dismayed by Defendants' argument in their brief that defense counsel Lax's summation was "entirely appropriate." (Dkt. 86 ("Defendants' Br.") at 15.) Defendants argue:

> It was not only not objectionable, but entirely reasonable, for defense counsel to *point to testimony and other evidence* that called into question plaintiff's story. During the defense closing, defendants suggested that one of plaintiff's counsel met with Petra Luna in the hallway with the retained translator to discuss her testimony

prior to her taking the stand, and that this discussion led Luna to change her testimony from her interview with investigators and her deposition.

(Defendants' Br. at 17 (emphasis added).)  Yet, as noted, Lax pointed to *no* testimony or other record *evidence* to support his statement.  He was not permitted to invite the jurors to become witnesses, nor to become a witness himself.  Nor should Lax have suggested to the jurors that they conjure up events happening in the hallway outside the courtroom.  This tactic was wholly inappropriate and inexcusable.[39]

Defendants go even further, arguing in their brief that "plaintiffs' counsel admitted in rebuttal that the facts which defense counsel raised in summation—that the witness left the courtroom and so did Ms. Harris-Marchesi—did in fact occur" stating that "defense counsel did nothing improper in making the argument which referenced what factually occurred during the trial."  (Defendants' Br. at 18.)  First, Brewington did not "admit" anything.  He stated,

> "And the fact that [Lax] would talk about Ms. Luna, and claim that somehow someone convinced that lady . . . to do something wrong, or that myself, or Ms. Harris-Marchesi went into the hallway, that she disappeared—ladies and gentlemen, you got to go to the bathroom, sometimes you go to the bathroom, but the witness was in here, and somehow there's something wrong."

(Tr. 1318.)  Second, and more importantly, the fact of who was or was not in the hallway, or what might or might not have happened in the hallway *was not evidence* and should not have been relied upon by the jury, *in any way*, in reaching its verdict.  That defense counsel do not acknowledge this principle, and have only redoubled their efforts to justify Lax's conduct, is, indeed, troubling.

---

[39] Had the defense wanted to argue Luna's bias to the jury, it could have *properly* done so by laying an *evidentiary* foundation for the argument, such as eliciting testimony from Luna about any meetings she might have had with Plaintiffs' lawyers or any antipathy she might have had toward the police.  Failing to do so and simply launching a baseless sneak attack during closing is underhanded and unbefitting an officer of the court.

Perhaps even more improper than defense counsel Lax's suggestion that Harris-Marchesi influenced Luna to change her testimony in some hallway meeting, was his attempt to imply that the Spanish language interpreter might have doctored his translation to aid Plaintiffs. In connection with his argument about Luna's testimony changing favorably to Plaintiffs, Lax pointedly asked the jury: "And did you notice how Mr. Brewington greeted the translator?" (Tr. 1294.) Lax clearly was suggesting to the jury that the interpreter had translated, and perhaps altered, Luna's testimony to make it more favorable to Plaintiffs. As with Luna, Lax had not sought to establish an *evidentiary* basis for this innuendo. While the interpreter was not a fact witness, Lax could have asked to *voir dire* him outside the presence of the jury regarding any potential bias, such as questions about his relationship, if any, with Plaintiffs' counsel or Luna, how much money he was paid to translate, or his knowledge or feelings about the case, if any. Or Lax could have challenged his qualifications to translate through *voir dire*.[40] However, as with Luna, Lax chose instead to launch a baseless sneak attack on the interpreter during closing, once again inviting the jurors to become witnesses and to engage in rank speculation based *solely* on the manner in which Brewington purportedly "greeted the translator." Lax's attempt to discredit the interpreter based on nothing but a greeting was highly inappropriate.

Nevertheless, the Court does not find that defense counsel's improper statements during closing argument were sufficiently prejudicial to warrant a new trial. As noted, "[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Marcic*, 397 F.3d at 124. And "[n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings." *Id.* at 127. The Court has considered Lax's misconduct in the

---

[40] The Court notes that the translator was a federal court-certified translator who provided translation under oath. (Tr. 759, 765, 1295.)

context of the trial as a whole. *Graham*, 128 F. Supp. 3d at 698. While his comments were plainly improper and relevant to an important issue before the jury—*i.e.*, whether the only non-party fact witness was telling the truth—the comments were brief and tenuous in nature, Plaintiffs' counsel promptly objected, and the Court immediately addressed the comments with the jury, telling it to disregard them. Plaintiffs' counsel also had the opportunity to respond to the improper references in his subsequent closing statement.[41] Furthermore, as discussed in Part II above, because there was substantial support for the jury's verdict, Lax's improper statements were *de minimis*. *Marcic*, 397 F.3d at 124 (explaining that where "the jury's verdict finds substantial support in the evidence," counsel's improper statements will frequently be *de minimis* in the context of the entire trial").

The cases cited by Plaintiffs do not to compel a different result. For example, in *Koufakis v. Carvel*, a civil action over a breach of contract relating to a frozen dairy products dealership, the plaintiff's attorney, in summation, repeatedly characterized the defendant as a member of the mafia, repeatedly referred to the defendant's wealth, repeatedly drew attention to the defendant's failure to testify, called the jury's attention to other litigation that was not part of the record, consistently misused findings of the Federal Trade Commission trial examiner, and in sum "so persistently and continuously abused the freedom afforded counsel that his presentation— particularly in summation—was based on an appeal to passion and prejudice not warranted by the proof." *Koufakis*, 425 F.2d 892, 904 (2d Cir. 1970) (internal quotation omitted). In *Koufakis*, the

---

[41] Additionally, as previously discussed, based on the evidence before it, the jury could have chosen not to credit Luna's testimony or to give it little weight for other reasons. In his closing, Lax properly pointed out aspects of Luna's account that appeared to have changed from her interview by the police and her deposition in this action. Luna also admitted during her testimony to not having a clear view of the shooting itself. And, as noted, Luna's testimony about the positioning of Plaintiff's body when she last saw him on the ground conflicted with Plaintiffs' own theory of the case and almost all of the other evidence, including Plaintiffs' medical and bullet trajectory evidence, and thus appeared to be mistaken.

Second Circuit further found that the district court had not sufficiently cured the prejudice because the court's responses were based on its conclusion that the jury did not take the attorney seriously. *Id.* at 905. Thus, the improper comments made by the attorney in *Koufakis* were far more prejudicial and sustained than Lax's isolated comments here, and, in contrast to *Koufakis*, the Court directly addressed Lax's comments with a curative instruction that was proportional to their weight and the risk of prejudice.

In sum, the Court does not find that a new trial is warranted, because defense counsel Lax's improper statements did not "so infect [the] trial with undue prejudice or passion as to require reversal." *Marcic*, 397 F.3d at 124.

## C. Defense Counsel's "New Argument" in Closing Was Not Improper

Finally, Plaintiffs argue that a new trial is warranted because the Court permitted defense counsel to present a new theory during closing argument that was unsupported by the evidence. Plaintiffs reference a portion of defense counsel Lax's closing argument in which he stated, "plaintiffs' counsel made a lot about plaintiff being on the ground, this whole thing, but the fact is plaintiff with the gun in his pocket fits with everything else." (Tr. 1311.)

Even assuming that this somewhat vague and confusing comment meant what Plaintiffs say it meant—*i.e.*, that "it was irrelevant whether [Plaintiff] was on the ground pointing the air pistol or standing when he was shot because the pointing of the air pistol justified Defendant Perez's use of force against Plaintiff" (Pl.'s Brief at 20)—Defendants did not commit error in making such a statement. First, Plaintiff points to no case law prohibiting a party in a civil case from changing its theory after the evidence has been presented. Second, Plaintiffs had the burden of proving by a preponderance of the evidence at trial that the shooting of Plaintiff was unjustified; in other words, that Plaintiff did not do something that justified Officer Perez shooting him. (Tr. 1332 (Court instructing jury that Plaintiffs "ha[d] the burden of proving each of the essential

elements of their claims by a preponderance of the evidence"); Tr. 1346 (Court instructing jury that "[i]f a police officer reasonably believes that the person being arrested poses a significant threat to kill or inflict serious bodily injury on that police officer, or another, the police officer may use lethal force"))  Almost all of Plaintiff's evidence went toward establishing that Plaintiff was on the ground—*e.g.*, Bhagan was unable to see Plaintiff; Luna did not see Plaintiff standing up when she heard the shots; and Herdsman did not see Plaintiff until after the shooting.  Though Luna testified that when she last saw Plaintiff on the ground before the police arrived, he was not holding a gun, the only witness who affirmatively testified that Plaintiff did not point a gun at the officers was Plaintiff.  But in the same testimony, Plaintiff acknowledged having no memory of the encounter.  Thus, Plaintiffs' evidence left open a plausible, alternative theory of the case, namely, that Plaintiff, although on the ground or not fully standing (*e.g.*, kneeling), waved or pointed the gun in such a way that the officers were justified in shooting and arresting him.  While such a theory, if adopted by the jury, would require it to reject Ambrosino's and Perez's testimony about Plaintiff standing at the time he was shot, the jury was entitled to reject that part of their testimony while accepting other parts, including that Plaintiff pointed a gun at them, thereby justifying the shooting and arrest.  *See Hoyte v. Nat'l R.R. Passenger Corp.*, 04 Civ. 5297, 2006 WL 2053383, at *3 n.2 (S.D.N.Y. July 24, 2006) ("The jury is not required . . . to treat credibility as an all-or-nothing matter, and it is fully within the jury's fact-finding discretion to credit portions of a witness's testimony and discredit others."); (Tr. at 1329–30 (Court instructing jurors that they could choose to credit certain elements of a witness's testimony even while discrediting other portions:  "[i]nconsistencies or discrepancies in the testimony of a witness . . . may or may not cause you to discredit such testimony," and "[i]n weighing the effects of a discrepancy, you should consider whether it pertains to a matter of importance or an unimportant

detail, and whether the discrepancy results from an innocent error or intentional falsehood").) Thus, although it might be counter-intuitive for the jury to credit Ambrosino's and Perez's testimony that Plaintiff pointed a gun at them, but discredit their testimony that Plaintiff was standing up, it was not improper for Lax to argue, to the extent that he did,[42] that the jury could do so, based on the evidence before it.

Indeed, the cases cited by Plaintiffs support this conclusion. In *Martin v. Citibank, N.A.*, the court found that "[i]f *all* of the witnesses deny that an event *essential* to plaintiff's case occurred, he cannot get to the jury simply because the jury might disbelieve these denials" and "[t]here must be some affirmative evidence that the event occurred." *Martin*, 762 F.2d 212, 217–18 (2d Cir. 1985) (emphasis added) (quoting 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2527, at 563 (1971)). In the instant case, it was not essential to the officers' defense that Plaintiff was standing when he was shot. The critical fact that they needed to prove was that Plaintiff posed an immediate threat to the officers that justified the shooting. Here, there was such evidence, *i.e.*, Perez's and Ambrosino's testimony. There was also circumstantial evidence to support the theory that Plaintiff was on the ground when he was shot, including Plaintiff's own testimony and Luna's testimony.

Plaintiffs also cite *Cameron v. City of New York* for the proposition that "[t]o warrant an instruction, [a]ll that a party needs to show is that there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." *Cameron*, 598 F.3d 50, 69 (2d Cir. 2010). Again, while a theory that placed Plaintiff on the ground or kneeling while pointing a gun would raise difficult questions about why Officers Ambrosino and Perez testified

---

[42] Again, the Court finds that Lax's comment was vague and fleeting, at best, and it is hard to imagine that the jury understood Lax to be making the argument that Plaintiffs have construed. Even assuming that Lax was making this argument, it certainly was not done so forcefully.

otherwise, the Court cannot find that such a theory did not have "some evidence supporting" it. As noted, there was testimony that Plaintiff pointed a gun, and testimony that Plaintiff was on the ground or kneeling. Defendants were permitted to argue that even if the jury found that Plaintiffs' evidence established that Plaintiff was on the ground when he was shot, the jury could still find that Plaintiffs had not proven that the shooting was unjustified.

Finally, even assuming *arguendo* that defense counsel's brief and vague comment suggesting a "new" or alternate theory was improper, it clearly did not rise to the level of warranting a new trial, when considered in the context of the entire trial and, even more narrowly, in the context of defense counsel's closing. *See Marcic,* 397 F.3d at 124 ("[R]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal."); *id.* (stating that where "jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial."); *see also Graham*, 128 F. Supp. 3d at 698 (explaining that, in evaluating Rule 59(a) motion based on allegedly improper remarks by counsel, the court "must consider such a claim in the context of the trial as a whole").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a new trial pursuant to FRCP 59(a) is denied. The Clerk of Court is respectfully directed to enter judgment and close this case.


SO ORDERED.


*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: April 21, 2017
Brooklyn, New York